**FUN–DAMENTAL TOO, LTD.,**
**Plaintiff–Appellee,**

v.

**GEMMY INDUSTRIES CORP.; Kay–Bee Toy & Hobby Shops, Incorporated,**
**Defendants–Appellants.**

**No. 490, Docket 96–7489.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 11, 1996.

Decided April 4, 1997.

---

Gerard F. Dunne, New York City, for Defendants–Appellants.

Jeffrey L. Eichen, Doylestown, PA (Mark P. Monack, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for Plaintiff–Appellee.

Before CARDAMONE, MAHONEY,* Circuit Judges, and RESTANI,** Judge.

CARDAMONE, Circuit Judge:

This is an appeal in a trade dress infringement case. For the purpose of legal analysis, trade dress is generally broken down into two categories: product configuration, which relates to the design of a product distinct from the package in which it is sold, and product packaging. Among the several issues we have to resolve is whether it is appropriate—when evaluating the inherent distinctiveness of the packaging—to consider also the product itself, which is quite visible in an open-style box. Another difficult issue is the significance—when considering the likelihood of confusion between two products'

---

* The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996, and the appeal is being decided by the remaining two members of the panel, who are in agreement. *See* Local Rule § 0.14(b).

** Hon. Jane A. Restani, United States Judge for the Court of International Trade, sitting by designation.

packaging—of the junior user's copying the senior user's trade dress. Imitation may well be the sincerest form of flattery, but copying another's trade dress poses vexing legal problems.

Plaintiff Fun–Damental Too, Ltd. (plaintiff or Fun–Damental) brought suit in the United States District Court for the Southern District of New York (Mukasey, J.) against defendants Gemmy Industries Corp. and Kay–Bee Toy & Hobby Shops, Inc. (defendants, appellants, or Gemmy and Kay–Bee) for trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a), as well as for claims alleging injury to its business under New York law. According to Fun–Damental's complaint, Gemmy copied the packaging of plaintiff's "Toilet Bank," a retail novelty item, for use with defendant's similar product, the "Currency Can" (photographs of the two products as packaged are reproduced as an appendix to this opinion). Pending resolution of Fun–Damental's claims, Judge Mukasey granted a preliminary injunction prohibiting KayBee and Gemmy from manufacturing, selling or distributing the Currency Can in its present packaging or in any other packaging similar to plaintiff's. The injunction further directs Gemmy to bring all finished products from its Chinese factory to the United States and retain them here.

## BACKGROUND

### A. *Facts*

Fun–Damental is a Pennsylvania limited partnership that develops and sells novelty toys and gifts, most of which feature some mechanism for producing sound. These products are known in the toy industry as "impulse items," because they are purchased based on a consumer's quick decision made while in the store, without comparison shopping or investigation. Fun–Damental sells its line of products through large chains such as Walgreen's, Service Merchandise and Toys 'R' Us, and through gift shops, hardware stores, college bookstores and other small retail outlets.

In 1992 plaintiff began developing the Toilet Bank, a toy coin bank closely resembling the familiar white tank toilet. An important feature of this product is its ability to simulate the flushing sound of a toilet when its handle is depressed. "Flushing" the Toilet Bank also enables coins placed in the toilet bowl to drop into the bank's base. When development was completed in 1994, Fun–Damental began promoting its novelty coin bank through its catalogs and at trade shows. Consumers have since purchased more than 860,000 of these items at a retail price of $15 to $20 each.

In May 1995 defendant Kay–Bee, a major toy and novelty retailer, expressed interest in buying the Toilet Bank. But after examining a sample, Kay–Bee decided against carrying the product because of its high cost relative to other impulse items. In September 1995 Fun–Damental's sales manager visited Kay–Bee and noticed a toilet-shaped bank resembling the Toilet Bank on a shelf in the office of Kay–Bee's purchasing agent in charge of impulse items. The sales manager's request to examine the item more closely was turned down. In October Fun–Damental sent Kay-Bee a product notice requesting to examine a sample of the observed product for possible infringement. No sample was sent.

It turned out that defendant Gemmy, a novelty manufacturer, had approached Kay–Bee and supplied it with toilet-shaped coin banks similar to Fun–Damental's. Kay–Bee was able to purchase Gemmy's Currency Cans at a lower wholesale price than the Toilet Bank, and was therefore able to retail Gemmy's product at $9.99 each. The record reveals that when Gemmy's vice-president learned of Fun–Damental's Toilet Bank, he contacted his company's Chinese factory in May 1995 and asked it to design a similar product. In the design phase of the Currency Can, a sample of Fun–Damental's Toilet Bank was sent to Gemmy's Chinese manufacturer. The Gemmy official testified that the Currency Can was designed with dimensions virtually identical to those of the Toilet Bank in order to compete effectively with it.

### B. *Trade Dress*

Plaintiff's product is displayed in stores in a royal blue triangular-shaped box. The Toilet Bank itself is visible within the open-style

box, which allows a consumer access to the toilet handle so that the flushing sound may be tested. The toy's bowl is covered with a clear plastic cover that includes a raised three-dimensional circle to which is affixed a gray sticker depicting a coin. The bank is held in place in its box by a 1/4 inch strap running up one side of the toilet bowl, through the plastic cover, and down the other side.

The product name "TOILET BANK" appears in yellow letters on the royal blue box's lower front panel. The four inch-high upper rear panel is decorated with the product name and two pictures demonstrating how to use the product. The top picture shows a hand holding a coin over the toilet bowl, and the bottom one shows an index finger depressing the handle with the message "REAL FLUSHING SOUND" in white letters on a red bubble. In the upper right hand corner of this panel is a yellow starburst with the words "REAL FLUSHING SOUND" in red letters. Below it is a yellow arrow pointing down toward the handle with the legend in red: "TRY ME" and in smaller letters: "PRESS HANDLE." The same message appears on a red arrow sticker, affixed to the toilet tank, pointing diagonally towards the silver handle.

Gemmy's Currency Can is packaged in a box identical in its configuration and dimensions to Fun–Damental's box, including the various tabs and slots used to assemble each. Gemmy has used two different color schemes on its boxes. The first version featured a yellow background with powder blue squares in a "bathroom tile" design. At the behest of Kay–Bee's purchasing agent, who preferred a brighter color scheme, the second and more widely-used design features a deeper blue background with bright yellow "bathroom tile" squares. In the center of their upper panels, both of Gemmy's boxes include a starburst with yellow lettering: "A BANK WITH A REAL FLUSHING SOUND!" Both also include, at the right of the upper panel, an arrow pointing down toward the silver handle with "PRESS HANDLE" in small yellow lettering followed by "TRY ME!" in large white letters. A similar red arrow is affixed to the tank of the toilet and

angled toward the toilet's handle. Gemmy's Currency Can also has a flat plastic cover over the toilet bowl opening on which a gray coin-like sticker is affixed.

## C. *Prior Legal Proceedings*

Fun–Damental filed its complaint against Gemmy and Kay–Bee on February 13, 1996, alleging trade dress infringement in violation of § 43(a) of the Lanham Act, injury to business reputation under N.Y. Gen. Bus. L. § 368–d, and unfair competition and tortious interference with contractual relations under New York common law. Plaintiff also sought a preliminary injunction and an order of impoundment. After a hearing, the district court granted the preliminary injunction in a March 18, 1996 Memorandum and Order which was subsequently amended on March 20. Kay–Bee was ordered to remove Currency Can units from its retail shelves and place them in storage during the pendency of the injunction. The district court ordered Gemmy to acquire all units of the Currency Can (packaged in the allegedly infringing trade dress) located outside the United States and ship them to its warehouse in this country for storage, along with all units presently in its possession. From the issuance of this preliminary injunction, defendants appeal. We affirm.

## DISCUSSION

Defendants contend it was error for the district court (1) to find Toilet Bank's packaging inherently distinctive when considered apart from the product; (2) to determine that Fun–Damental's trade dress was nonfunctional and therefore subject to Lanham Act protection; (3) to rely heavily on the evidence of product copying as the basis for finding that Gemmy's packaging would likely cause confusion between the two products; and (4) to exercise extraterritorial jurisdiction under the terms of the preliminary injunction that would require Gemmy's overseas purchase of Currency Cans. Before we analyze these contentions, we set forth briefly the familiar standards governing the issuance of a preliminary injunction.

To obtain a preliminary injunction, a plaintiff must show (1) irreparable harm

and (2) either (a) that it is likely to succeed on the merits or (b) sufficiently serious questions regarding the merits of the claim to make them fairly litigable, with the balance of hardship tipping decidedly in the plaintiff's favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). We review the issuance of a preliminary injunction for an abuse of the district court's discretion. That court abuses its discretion only if it applies an incorrect legal standard, bases the preliminary injunction on a clearly erroneous finding of fact, or issues an injunction that contains an error in its form or substance. *See Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 315 (2d Cir.1982).

Defendants concede irreparable harm would result if plaintiff demonstrates its Lanham Act claim is likely to succeed. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir.1995) (a showing of high probability of confusion creates a presumption of irreparable harm in a trademark case). Our initial inquiry therefore centers on the question of whether Fun–Damental is likely to succeed on the merits of its trade dress infringement suit.

### I The Lanham Act in General

The Lanham Act is designed to protect trademarks for the benefit of both the consumer and business. Congress recognized that a trademark aids competition in the marketplace because it helps a consumer distinguish among competing products. S.Rep. No. 79–1333 (1946), *reprinted in* 1946 U.S.C.C.A.N. 1274, 1275. Trademarks also encourage producers to maintain a high quality product by assuring that any goodwill associated with their products is not misappropriated by competitors. *Id.*

■ Section 43(a) of the Lanham Act provides a private cause of action against any person who

in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person....

15 U.S.C. § 1125(a). The statutory protection of unregistered trademarks extends to trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992) (" § 43(a) provides no basis for distinguishing between trademark and trade dress."). The concept of trade dress encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995). These other elements include "the appearance of labels, wrappers, and containers used in packaging a product as well as displays and other materials used in presenting the product to prospective purchasers." Restatement (Third) of Unfair Competition § 16 cmt. a (1995).

■ To establish a claim of trade dress infringement under § 43(a), plaintiff must first demonstrate that its trade dress is *either* inherently distinctive *or* that it has acquired distinctiveness through a secondary meaning. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58. However, an otherwise inherently distinctive trade dress is entitled to protection only if it is also nonfunctional. *Id; LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 76 (2d Cir.1985). Second, plaintiff must demonstrate that there is a likelihood of confusion between defendant's trade dress and plaintiff's. *Two Pesos*, 505 U.S. at 769–70, 112 S.Ct. at 2757–58.

In the instant case, the district court found that Fun–Damental's trade dress is inherently distinctive and that a substantial likelihood of confusion between the two coin banks exists. It also determined that although individual features of plaintiff's trade dress may serve a particular function, the trade dress, viewed as a whole, was nonfunctional.

### II Distinctiveness of the Toilet Bank Trade Dress

#### A. Standard for Determining Distinctiveness

We ordinarily evaluate inherent distinctiveness of trade dress by applying the trade-

mark classifications as set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). *See Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 583 (2d Cir.1993) (adopting Judge Friendly's test to evaluate the inherent distinctiveness of product packaging). Within this framework, trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection. *Two Pesos*, 505 U.S. at 768, 112 S.Ct. at 2757. A descriptive trade dress may be found inherently distinctive if the plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–58. A generic trade dress receives no Lanham Act protection. *Id.* at 768, 112 S.Ct. at 2757.

■ The Supreme Court has emphasized that an inherently distinctive trade dress is one whose "intrinsic nature serves to identify a particular source of a product," *id.*, although it may not yet have widespread identification among consumers. *Id.* at 771, 112 S.Ct. at 2758–59. Consumers generally rely on packaging for information about the product and its source. But the varieties of labels and packaging available to wholesalers and manufacturers are virtually unlimited. As a consequence, a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection. *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1069 (2d Cir.1995); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir.1981).

■ Yet trade dress protection has limits. A trade dress that consists of the shape of a product that conforms to a well-established industry custom is generic and hence unprotected. For example, the cosmetics industry's common use of black, rectangular-shaped compacts renders that packaging generic. *Mana*, 65 F.3d at 1070; *see also Paddington*, 996 F.2d at 583 (soda industry practice would render green cans generic for

the purpose of packaging lime-flavored soda). In short, despite the broad opportunity to design an arbitrary or fanciful trade dress, a specific trade dress must still be evaluated to determine whether it is so distinctive as to point to a single source of origin and thereby be entitled to Lanham Act protection.

Defendants urge us to adopt a more stringent standard of distinctiveness than that used by the trial court. Recently we declined to use the *Abercrombie* spectrum of distinctiveness in a trade dress case that involved features of the product itself. *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996 (2d Cir.1995). In an attempt to extend that rationale, defendants suggest we adopt an alternative test for inherent distinctiveness of trade dress set forth in *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977). Under *Seabrook*, the inquiry is whether the design or shape of a package is a common, basic one, or whether it is unique or unusual in a particular field; whether the design is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a trade dress or ornamentation for such goods, or whether it is one capable of creating a commercial impression separate from the accompanying words. *Id.*

■ We see no reason to abandon the *Abercrombie* distinctiveness spectrum in this case. Several reasons lead us to decline. First, we have expressly ruled that the *Abercrombie* classifications apply to packaging. *Paddington*, 996 F.2d at 583. Second, *Knitwaves* is a pure product configuration case, separate from product packaging, the category of trade dress at issue in this case. In *Knitwaves*, the trade dress lay in the product itself, rather than in a symbol—a trademark or packaging—associated with the product. It was therefore difficult to define some aspect or feature of the trade dress as "descriptive" or "arbitrary" in relation to the product. *See Knitwaves*, 71 F.3d at 1007–08 (quoting *Duraco Prods. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1440–41 (3d Cir. 1994)). In contrast, a store display of a product's packaging style creates an image of the product more readily separated from the

product itself. Moreover, although there may be a finite set of ways to configure a product, the variety of packaging available for a given product is limited only by the bounds of imagination. These factors render packaging more suitable than product configuration for classification under the *Abercrombie* system as arbitrary or fanciful, suggestive, descriptive, or generic.

Third, use of the *Abercrombie* test tracks the purpose of the Lanham Act to identify source. That is, it is consistent with the Supreme Court's emphasis on a trade dress' capacity to "identify a particular source of the product." *Two Pesos,* 505 U.S. at 771, 112 S.Ct. at 2759. While a more stringent test is necessary in the product configuration context, applying *Abercrombie* to product packaging serves the aims of the Lanham Act because consumers are more likely to rely on the packaging of a product than on the product's design as an indication of source. Restatement (Third) of Unfair Competition § 16 cmt. b (1995). In contrast, over-inclusive protection of the product design risks conferring benefits beyond the intended scope of the Lanham Act and entering what is properly the realm of patent law. *See Fabrication Enters., Inc. v. Hygenic Corp.,* 64 F.3d 53, 59 n. 4 (2d Cir.1995). Thus, though the *Abercrombie* classifications were originally developed for analysis of word marks, we conclude that because of the endless number of product packaging options the *Abercrombie* test is appropriately applied in this trade dress case.

### B. *Distinctiveness in the Instant Case*

■■■ Defendants insist that the Toilet Bank's trade dress is not inherently distinctive, principally because the elements identified as part of that characterization are generic. Classification under the *Abercrombie* spectrum of distinctiveness is a question of fact reviewed under the clearly erroneous standard. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1039–40 (2d Cir.1992) (classification of trademarks). We evaluate trade dress distinctiveness by looking at all its elements and considering the total impression the trade dress gives to the observer. *Paddington,* 996 F.2d at 584.

Concededly, a number of individual features of the Toilet Bank's trade dress are common in the toy industry; for example, the triangular shape of the box and its open styling are found everywhere on toy store shelves. The red arrows stating "Try Me," the starburst (separate from the notation "flushing sound"), and the raised blister are similarly quite usual legends in the toy business. Although some of the individual elements of a trade dress are generic or descriptive, the impression given by all of them in combination may be inherently distinctive. Such was what the district court found here; and we cannot say that this finding is clearly erroneous.

■■■ Gemmy maintains that the trial court improperly considered the similarities between its product and Fun–Damental's when making the inherently distinctive determination regarding the Toilet Bank's trade dress. We disagree. Although Fun–Damental makes no claim regarding the copying of its product, it was appropriate to consider the packaging in conjunction with the product, rather than simply the empty box. "[T]rade dress today encompasses a broad concept of how a product presented to the public looks, including its color, design, container, and all the elements that make up its total appearance." *Mana,* 65 F.3d at 1069.

This "total look" approach is the only workable way to consider such elements of the trade dress as the arrow sticker that is affixed to the Toilet Bank's tank. Because the box is open in order to display the product, it was proper to analyze Fun–Damental's trade dress as seen by consumers—including the Toilet Bank product. Further, there is no risk of "spillover" protection for the Toilet Bank as a product here since the injunction is limited to the sale of a similar product in a *particular* package, rather than an absolute ban on the sale of the Currency Can in an open-style box. In sum, we conclude that looking at the product itself in the context of its packaging is a proper method of analyzing open-style packaging for trade dress protection.

## III Functionality Defense

Gemmy and Kay–Bee assert as an affirmative defense that the features of Fun–Damental's packaging—the open-style packaging, the raised blister cover on the toilet bowl, the gray coin decal, and the tie-down strap—are functional and therefore outside the scope of Lanham Act protection. Further, they aver it was error to rule that a collection of functional features may be translated into protected nonfunctional features because they contribute to the trade dress' overall impression.

 A key element in deciding a trade dress case is whether the trade dress is functional. If it is functional, promotion of fair competition between producers demands that such trade dress be denied Lanham Act protection. The reason is simple. When a court protects a trade symbol it precludes competitors from using the same symbol, and if that protection covers a functional feature, the first producer thereby obtains a potential monopoly placing other producers at a competitive disadvantage. Hence, a functional trade dress will not receive protection.

 Whether a trade dress is or is not functional is a question of fact disturbed on appeal only if clearly erroneous. *LeSportsac*, 754 F.2d at 77. When considering the functionality of a trade dress, we must assess the degree of usefulness of the similar features on the competing dress, the degree of similarity between the non-useful, ornamental features of the packaging, and the feasibility of alternatives to the useful features. *See Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977 (2d Cir.1987). As we have observed, a useful feature of a product may also be source identifying. *Fabrication Enters.*, 64 F.3d at 59. Accordingly, defendants must show more than usefulness of plaintiff's packaging; they must show that the features in question are essential to effective competition in a particular market. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 70 F.3d 251, 253 (2d Cir.1995); *Fabrication Enters.*, 64 F.3d at 59 (finding of usefulness is not tantamount to finding of functionality).

 The open-style packaging of the Toilet Bank is obviously useful. The box performs a variety of useful functions: displaying the actual product to the consumer, offering protection during shipping, and making the product easy to stack on shelves. In addition, the open-style nature of the box allows consumers easy access to the product to push the handle down to hear the flushing sound. Although this particular packaging incorporates effective features for marketing the product, the defendants failed to persuade the district court that it is essential to effective competition in the novelty toy market. The district court found that at least two alternative packaging designs provided consumer accessibility to the bank's handle and allowed for cost-effective bulk shipping. Similarly, it identified viable alternatives to the plastic blister bowl cover and the tie-in. Because Gemmy failed to prove that it would be placed at a significant competitive disadvantage if not allowed to use this particular open-style box design, plastic blister and tie-in, the district court determined that the features of the Toilet Bank's packaging are nonfunctional. This finding was not clearly erroneous.

## IV Likelihood of Confusion

### A. Polaroid *Factors*

 Gemmy and Kay–Bee take issue with the trial court's holding with respect to the second prong of the trade dress protection test, *i.e.*, its finding that there is a likelihood of confusion between Fun–Damental's Toilet Bank and Gemmy's Currency Can because of the similar trade dress. The question of whether the public is likely to confuse two products based on their packaging is not an easy one. To aid in this task, we examine likelihood of confusion in light of the eight factors articulated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961). These non-exclusive factors are: (1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer

group. We review the court's determination with respect to each individual factor under a clearly erroneous standard, but the ultimate holding of whether there is a likelihood of confusion, which is reached after weighing the above factors, is a legal issue reviewed *de novo. Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 75–76 (2d Cir.1988). Here, none of the findings with respect to the eight factors was clearly erroneous.

■■■ (1) *Strength of the Mark.* While the assessment of the trade dress' strength depends in part upon its classification on the *Abercrombie* spectrum, *see Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987), the essence of the analysis is to determine the strength of the trade dress in its commercial context. We analyze therefore the "tendency [of the trade dress] to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Id.* at 1225. The district court did not err in finding the Toilet Bank's trade dress was a strong mark based on the overall effect of the packaging.

■■■ (2) *Degree of Similarity.* The district court found plaintiff's and Gemmy's trade dress to be very similar. Both the details and the overall appearance of the packaged products support that finding. As previously noted, the shape and construction of the boxes are identical. Both products are fastened into their boxes with a tie across the base of the banks, and the bowls of both products are covered by a clear plastic bubble on which a gray "coin-like" sticker is affixed.

Moreover, Gemmy's overall color schemes, particularly the bright yellow tiles on the royal blue background, are very similar to Fun–Damental's use of royal blue with yellow lettering. Although the tile pattern differs from the solid blue background on the Toilet Bank box, the overlapping use of similar colors is likely to stand out in the mind of the consumer. Most of the arrows and starbursts are placed in parallel positions on the competitors' packages, although some of these elements vary in color. The arrow pointing down to the Toilet Bank's handle is yellow with red lettering, whereas Gemmy

uses a red arrow with yellow and white lettering on its brighter packaging and a purple arrow on the more subdued Currency Can package. The arrows affixed to the tanks of both toilet-shaped banks are red. Despite some variation between the individual elements of the trade dress, on the whole, these differences are minor and subtle, and the overall effect of the parallel use of multiple elements supports the finding of substantial similarity.

Defendants rely on *Bristol–Myers Squibb* for the proposition that a prominently displayed trade name on a product's packaging eliminates the possibility of confusion based on similarity of trade dress. 973 F.2d at 1046. We have recognized that "the prominent presence of well-known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other *Polaroid* factors." *Id.* However, the instant case involves trade names much less recognized than "Tylenol" and "Excedrin," at issue in *Bristol–Myers Squibb,* and we think the district court had ample ground for concluding that consumers are more likely to remember the coin bank's packaging than its name.

(3) and (4) *Proximity of Products/Bridging the Gap.* The third and fourth factors are not disputed. The products are nearly identical and would compete in the same market, supporting the finding of a likelihood of confusion.

■■■ (5) *Evidence of Actual Confusion.* Fun–Damental offered the direct testimony of its national sales manager to demonstrate actual confusion. He testified that some retail customers complained because they thought Fun–Damental was selling its Toilet Bank at a lower price to other retailers. Defendants argue that this evidence is inadmissible hearsay upon which the district court should not have relied and, even if admissible, it does not support a finding of actual confusion.

There is no hearsay problem. Hearsay is an out-of-court statement admitted for the truth of the matter asserted. *See* Fed. R.Evid. 801. The testimony in question was not offered to prove that Fun–Damental was

actually selling to some retailers at lower prices, but was probative of the declarant's confusion. Further, Federal Rule of Evidence 803(3) allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind. The district court properly considered the statements. *See Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982) (testimony by plaintiff's employees that customers called for defendant company was admissible to show confusion in minds of declarants).

With respect to the weight of the evidence, the trial court credited the sales manager's testimony and, while noting that the showing of actual confusion was not overwhelming, found the statements sufficient to support a finding of actual confusion at the preliminary injunction stage of the proceedings.

■ (6) *Junior User's Bad Faith.* The district court found Gemmy acted in bad faith by intentionally copying Fun–Damental's Toilet Bank and its packaging. On appeal, defendants dispute this finding as improperly based on the conclusion that Gemmy copied Fun–Damental's Toilet Bank, rather than by consideration of the trade dress itself. Defendants correctly assert that the intentional copying of a product—by itself—generally is not relevant to a trade dress infringement claim. However, the combined effect of placing an identical product in copied packaging could support the inference that the "copying" manufacturer/distributor was acting with the intent to create confusion with the senior user's product.

The finding that Gemmy intentionally copied Fun–Damental's packaging was based on the trial court's observation that the unfolded pattern of Gemmy's box is identical to that of Fun–Damental and departed from the pattern of the open-style boxes Gemmy had previously used. Additional proof presented could support the inference that Gemmy and Kay–Bee intended to mislead consumers by appearing to mark down prices on the Currency Can. Although the product always sold for $9.99, its price sticker listed an "original price" which was subsequently crossed out. This pricing system created the confusing

impression that the higher priced product produced by plaintiff, which the consumer may have seen on an earlier occasion, is being sold now for less. Hence, the finding of bad faith was amply supported.

■ (7) *Quality of the Defendant's Product.* We see no clear error in the finding that Gemmy's Currency Can was of lower quality than the Toilet Bank, and that this weighed in plaintiff's favor. *See Hasbro,* 858 F.2d at 78 (the junior user's inferior product may affect adversely the senior user's reputation). Specifically, the district court judge, who was in the best position to make the determination, found the seams on the Currency Can inferior, and its flushing sound not as authentic as the Toilet Bank's.

(8) *Sophistication of the Consumers.* This last factor also tips in favor of Fun–Damental. The district court determined that the potential buyers of toilet-shaped coin banks, generally speaking, lack the sophistication to distinguish Gemmy's product from Fun–Damental's, particularly in view of the fact that the product is a novelty item ordinarily bought on impulse.

## B. De Novo *Review of Likelihood of Confusion*

■ Although we have reviewed the district court's findings as to each of the *Polaroid* factors for clear error, we review *de novo* the district court's weighing of these factors to reach its ultimate conclusion as to likelihood of confusion. In performing this review, we bear in mind that the test of confusion is not whether the products can be differentiated when the "Currency Can" trade dress and the "Toilet Bank" trade dress are subject to a side-by-side comparison. Instead, we must ask whether they create the same general overall impression such that a consumer who has seen the "Toilet Bank" trade dress would, upon later seeing the "Currency Can" in its trade dress alone, be confused. *See American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir.1978) (side-by-side test inapplicable in trademark context); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir.1979) (rejecting side-by-side test in

trade dress analysis). We are satisfied that the district court did not err in concluding that the two trade dress create the same general impression and, as a result, are likely to confuse consumers.

■ Defendants declare that the district court disproportionally weighed the "bad faith" factor in its preliminary likelihood of confusion analysis. We have cautioned that the absence of good faith—evidenced in this case by proof of intentional copying—by itself cannot control, *Centaur*, 830 F.2d at 1228. Where comparison of the marks or trade dress of the two products reveal no fair issue regarding a confusing similarity of appearance, defendant's copying will not establish a Lanham Act violation. *Warner Bros. v. American Broad. Co.*, 720 F.2d 231, 246–47 (2d Cir.1983).

It cannot automatically be inferred that intentionally copying a plaintiff's trade dress is for the purpose of deceiving or confusing consumers as to the source of the product. *See* Andrew C. Finch, *When Imitation is the Sincerest Form of Flattery: Private Label Products and the Role of Intention in Determining Trade Dress Infringement*, 63 U. Chi. L.Rev. 1243, 1255 (1996). A defendant who copies his competitor's trade dress may have valid reasons, wholly apart from a desire to confuse consumers, for doing so. *See id.* (noting that copying may be motivated by belief that trade dress is functional or generic, or by belief that copying is the best way to inform consumers that a generic product is a lower-priced alternative to the competitor's products). Indeed, copying in order to market a functionally equivalent alternative product might well benefit consumers, which is one of the aims of the Lanham Act.

Hence, in the absence of evidence, apart from proof of copying, that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying. On the other hand, if there is additional evidence that supports the inference that the defendant sought to confuse consumers as to the source of the product, we think the inference of bad faith may fairly be drawn to support a likelihood of confusion determination.

In this case, the conclusion that Gemmy's copying was done in bad faith to cause confusion is supported by more than simply the fact of copying. For example, defendants' use of a "false markdown"—by crossing out a marked price comparable to the Toilet Bank's and selling the Currency Can at what appears to be a discount price—is additional evidence from which one could infer an intent to mislead consumers as to the source of the product. Defendant's bad faith in copying its competitor's trade dress is relevant, particularly at this stage, where Fun–Damental's burden was only to raise a serious question on the merits of its likelihood of confusion claim.

We conclude that Fun–Damental has met its burden. The nature of the product as a novelty item affects the way it is purchased. The consumer may see the product more than once without focusing closely on its origin and be inclined to buy it if the price is right. The overwhelming similarities of the trade dress of the two coin banks—which are not sold side-by-side on a shelf—create the same general impression to the consumer's eye. The subtle distinctions on which defendants rely fail to put the consumer on notice that there is more than one source of origin within this narrow market for toilet-shaped banks. The difference in the price of the two products adds to the confusion. In this unsophisticated market, the marked-down price on the Currency Can is likely to lead the consumer to believe the price was simply reduced from the last time the consumer saw the product, rather than to put the customer on notice that this is a less expensive and different product from the Toilet Bank. Such inference is supported by testimony that some retail customers were in fact confused. We agree with the district court's conclusion—based upon all the *Polaroid* factors, including but not limited to defendant's bad faith—that there is a likelihood of confusion between the two products' trade dress.

We add, parenthetically, that the injunction does not place an undue burden on Gemmy, as the junior market entrant. It is free to sell the Currency Can in different packaging that will avoid confusion between its product and the product of its direct

competitor. Nor is Gemmy necessarily required to create a radically different package with no elements common to Fun–Damental's packaging.

### V Extraterritorial Nature of the Injunction

■ Gemmy and Kay–Bee argue for the first time on appeal that the district court's attempt to regulate Gemmy's acquisition of Currency Can units located in China is an improper extraterritorial extension of the Lanham Act. Generally, we will not consider issues that were not raised in the lower court. *Greene v. United States,* 13 F.3d 577, 586 (2d Cir.1994). But this is not an absolute rule, and limited exceptions are made when the error involves subject matter jurisdiction or where necessary to remedy an obvious injustice. *Schmidt v. Polish People's Republic,* 742 F.2d 67, 70 (2d Cir.1984); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 588 F.2d 24, 27 (2d Cir.1978); *see also* Jack H. Friedenthal, Mary Kay Kane & Arthur R. Miller, *Civil Procedure* § 13.4 at 601 n. 3 (2d ed. 1993). On occasion, we have also exercised our discretion to entertain arguments not raised in the trial court when the party raises new contentions involving only questions of law, and no need exists for additional fact finding. *See Vintero Corp. v. Corporacion Venezolana de Fomento,* 675 F.2d 513, 515 (2d Cir.1982) (per curiam).

Although federal question jurisdiction over the trade dress violation clearly exists under federal trademark law, defendants challenge an exercise of extraterritorial jurisdiction under the Lanham Act. Because of the quasi-jurisdictional nature of this issue, we analyze the scope of jurisdictional power conferred upon the district court by the Lanham Act, as it applies in this case. Resolution of this issue requires no additional fact finding.

Federal courts have applied the Lanham Act to activity occurring outside the United States when necessary to prevent harm to United States commerce. Thus, for example, the Supreme Court enforced the Lanham Act against an American citizen selling fake Bulova watches in Mexico on the ground that his sales in both Mexico and the United States harmed the American trademark hold-

er. *Steele v. Bulova Watch Co.,* 344 U.S. 280, 286, 73 S.Ct. 252, 255–56, 97 L.Ed. 319 (1952). At the same time we recognize that the extraterritorial reach of the Lanham Act is limited, and have stated that an injunction against a Canadian retailer using a Canadian trademark to sell products in Canada exceeded the scope of the Lanham Act. *Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 642–43 (2d Cir.1956).

■ We have read *Bulova* as establishing a three-part test for analyzing extraterritorial extensions of the Lanham Act. To apply the Act a court must be able to answer affirmatively the following questions: (1) does defendant's conduct have a substantial effect on United States commerce; (2) is defendant a United States citizen; and (3) is there an absence of conflict with trademark rights established under foreign law? *Id.* at 642. Relying on our decision in *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 746 (2d Cir.1994), defendants aver that the district court erred by not explicitly analyzing the case under the *Bulova* factors prior to its issuance of the extraterritorial injunction. Central to *Sterling Drug* was the district court's failure adequately to consider the extraterritorial effects of its injunction.

■ Although *Bulova*'s three-part framework was not explicitly utilized in the instant case, the defendants present no proof to support their claims that the preliminary injunction subject to challenge here is outside the limited extraterritorial authority of the Lanham Act. It directs Gemmy to acquire title to products that are currently warehoused in China and intended for its purchase and resale to Kay–Bee, the party that imports the units into the United States. The injunction aims to regulate an aspect of Gemmy's conduct—the importation of products—that clearly has substantial impact on United States commerce. To control the importation of the products in the packaging at issue, the district court reasonably required Gemmy to acquire the units in the allegedly violative packaging and ship them to the United States. Moreover, the injunction directly implicates only specific extraterritorial conduct of Gemmy, a United States corporation; the injunction does not prevent

either Gemmy or the Chinese factory from producing the Currency Can and selling it in different packaging. Nor has Gemmy pointed to anything that would indicate that this injunction creates a conflict of trademark rights under foreign laws. The *Bulova* test as explicated in *Vanity Fair* has therefore been satisfied.

## CONCLUSION

In sum, the preliminary injunction against Gemmy and Kay–Bee was properly issued. The district court did not abuse its discretion by finding that Fun–Damental is likely to succeed on the merits of its claim that the Toilet Bank's trade dress is inherently distinctive, that it is nonfunctional, and that there is a substantial likelihood of confusion between the Toilet Bank and the Currency Can, as presently packaged. Because all parties subject to the injunction are American corporations and the regulated conduct has a substantial effect on United States commerce, the injunction's reach over the extraterritorial conduct of these parties is properly within the power of the district court under the Lanham Act.

Affirmed.

APPENDIX

EXHIBIT 1: FUN-DAMENTAL'S TOILET BANK

EXHIBIT 21: GEMMY'S CURRENCY CAN