118 F.3d 56
 43 U.S.P.Q.2d 1375
 CHRYSLER CORPORATION, Plaintiff, Appellant,
v.
John C. SILVA, JR., d/b/a J.C. Silva Designs, Defendant, Appellee,
CHRYSLER CORPORATION, Plaintiff, Appellee,
v.
John C. SILVA, JR., d/b/a J.C. Silva Designs, Defendant, Appellant,
CHRYSLER CORPORATION, Plaintiff, Appellant,
v.
John C. SILVA, Jr., d/b/a J.C. Silva Designs, Defendant, Appellee.
 Nos. 95-1926, 95-1927 and 96-1231.
 United States Court of Appeals,
First Circuit.
 Heard Dec. 6, 1996.
Decided July 9, 1997.
 
 Jerre B. Swann, Atlanta, GA, with whom Kilpatrick & Cody, Robert D. Cultice, Goldstein & Manello, Boston, MA, Eric M. Dobrusin, and Harness, Dickey & Pierce, Troy, MI, were on brief, for Chrysler Corporation.
 Anthony M. Fredella with whom Fredella & Wheeler, Sommerville, MA, was on brief, for John C. Silva, Jr.
 Before CYR, Circuit Judge, ALDRICH and CAMPBELL, Senior Circuit Judges.
 BAILEY ALDRICH, Senior Circuit Judge.
 
 
 1
 This is an unusual case that goes back a long while, including a four year history prior to suit. Plaintiff Chrysler Corporation ("Chrysler") filed suit in the Massachusetts District Court in July 1991, under the Lanham Act, 15 U.S.C. §§ 1051 et seq., for trademark infringement, specifically trade dress, against John C. Silva, Jr. ("Silva"), and a number of other individual defendants who have settled out. At issue was Chrysler's allegation that Silva copied Chrysler's innovative "muscle car," the Dodge Viper. Silva counter-claimed, alleging that the shoe was on the other foot; that Chrysler was the one at fault, having stolen the allegedly infringed design from him. On December 9, 1993 the court, in a separate brief memorandum, ordered summary judgment for Chrysler on the counter-claim on the ground of estoppel.[1]
 
 
 2
 The first of Chrysler's demands was for a preliminary injunction against violation. This was denied, and ultimately, after a bench trial, the court dismissed Chrysler's complaint with a memorandum of findings. This was initially done on July 19, 1995. On August 4 Chrysler moved to amend the findings and to alter or amend the judgment, or, alternatively, for a new trial. The court took additional testimony and on January 9, 1996 it again entered judgment for defendant on the complaint. Both parties appealed. We affirm in part.
 
 
 3
 Just prior to oral argument before us, Silva died. At the argument date his (former) counsel appeared, saying that he had no client. On his stating that his argument was ready we said we would hear the oral arguments of both sides and reproduce them for the files. This has been done. We further stated that we would afford time for an administrator to be appointed for Silva and move to continue the case, if so minded. This, too, has been done. One Jeanne A. Silva, temporary administratrix of the estate of John C. Silva, Jr., has been substituted for the deceased Silva in all capacities. We continue with the appeals.
 
 I. Facts
 
 4
 It is, of course, well known that there is enormous competition that depends upon the body appearance of automobiles. It is not so well known that this is so important to true enthusiasts that custom builders make, or order made, special bodies to place over a standard chassis. This art can produce problems. See, e.g., Ferrari S.P.A. Esercizio v. Roberts, 944 F.2d 1235, 1244-45 (6th Cir.1991).
 
 
 5
 In 1988, spurred on by a conversation between its executives the previous year, Chrysler considered designs harking back, in part, to 1960's roadsters. A prototype was completed in time for the January 1989 International Automobile Show in Detroit. Here the reception was so good that Chrysler formed TEAM VIPER. By December 1991, it had four production units and in 1992 it produced 200 Vipers. It had spent approximately $8,000,000 to promote this vehicle and over $75,000,000 to bring it into production. It attracted a special class of buyers.
 
 
 6
 During the trial, as a defense to the infringement claim, Silva testified that he had contacted Chrysler by mail in October 1987 and offered it the opportunity either to purchase his design for a car Silva had dubbed the "Mongoose," for which he included sketches with his letter, or to contract with him to build a show car based on the design. He claimed that past experience in building cars for large manufacturers instilled in him the necessity of clearly marking the designs with proprietary statements of ownership and confidentiality before forwarding them to Chrysler. He also included a request that the sketches be returned if Chrysler was not interested. He received no response to his letter and the sketches were not returned.
 
 
 7
 In early 1989, Ronald Torlone, one of the original defendants, decided he wanted a "new look" for his 1979 Chevrolet Corvette. For this he retained a builder, Motor Incorporated, for which Silva worked as an independent contractor. They and another original defendant, Richard Galardi, produced the Mongoose.[2] Also in 1989, after seeing a picture of Chrysler's prototype for the Viper, Silva called Chrysler and eventually spoke with an in-house attorney who, after learning of the Mongoose, demanded that Silva stop work and destroy the vehicle. Silva refused, Chrysler brought this suit and Silva counterclaimed for the theft of his design.
 
 II. Analysis
 
 8
 Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides protection against:
 
 
 9
 (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
 
 
 10
 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....
 
 
 11
 15 U.S.C. § 1125(a).
 
 
 12
 In 1992, the Supreme Court held that § 43(a) extended to claims for infringement of trade dress. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 770, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). Trade dress has been defined as "the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer." Fun-Damental Too, Ltd. v. Gemmy Indus., 111 F.3d 993, 999 (2d Cir.1997) (internal citation omitted). In order to warrant protection, trade dress must be either inherently distinctive or have become so by acquiring a secondary meaning. Two Pesos, 505 U.S. at 769, 112 S.Ct. at 2757. Inherently distinctive trade dress cannot be functional, and to prevail on a claim of infringement, the defendant's product must have created a likelihood of confusion with regard to its source. See id.; TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir.1996).
 
 
 13
 The court found that the Viper "had acquired inherent distinctiveness through secondary meaning, that the trade dress was 'non-functional,' " and therefore entitled to trade dress protection, but that Chrysler failed to prove the likelihood of confusion between the two cars. It made several individual findings of fact. Relevant ones include:
 
 
 14
 11. Mr. Silva saw and/or read the press coverage of the Viper concept car in the Spring and Summer of 1989.
 
 
 15
 * * * * * *
 
 
 16
 13. Photographs of the Dodge Viper concept car served as the starting point for the car body designed by Mr. Silva for Mr. Torlone.14. Mr. Silva made significant modifications to the design of the Dodge Viper in his creation of the car body, including, but not limited to: the windshield; the rollbar; the nose area; the wrap-around area of the mirrors; and the cut lines.
 
 
 17
 15. Mr. Silva did not intend to duplicate or otherwise copy the Dodge Viper.
 
 
 18
 With these findings in hand, the court moved to the test for likelihood of confusion, consisting of eight relevant factors, see Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 3 (1st Cir.1993); Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir.1989), and determined that each party was entitled to prevail on four, as follows:
 
 
 19
 1. Similarity of the marks (dress)--Chrysler
 
 2. Similarity of goods--Chrysler
 3. Channel of trade--Silva
 4. Channel of advertising--Silva
 5. Class of prospective purchaser--Silva
 6. Evidence of actual confusion--Chrysler
 
 20
 7. Defendant's intent in adopting the dress--Silva
 
 
 21
 8. Strength of the dress--Chrysler.
 
 
 22
 On this basis, unless Silva prevails because of his lack of bad intent in adopting Chrysler's dress, it is difficult to understand why Chrysler, who prevailed here on similarity and strength of dress, should lose its case, it not being necessary, since the Lanham Act's amendment, to prove purchaser confusion, post. Beyond this seeming inconsistency it is hard to explain how the court could say, "[T]he Court rules, as a matter of law, that plaintiff did not establish a likelihood of confusion between its vehicle and the Silva vehicle." (emphasis supplied.) If the court meant matter of law, it was clearly wrong. There were ample lay witnesses, notably the other original defendants, expressly mentioned by the court, whose evidence precluded ruling as a matter of law in Silva's favor.
 
 
 23
 Study of its opinion as a whole leads us to conclude that the court really meant "find," or "conclude," and we will so address its decision. Chrysler says, as it must, Aktiebolaget Electrolux, that such a finding was plainly wrong.
 
 
 24
 A substantial part of the court's opinion is devoted to listed factors 3, 4 & 5, ante, concluding that purchasers would not be confused or misled. Chrysler concedes this; indeed it offered no evidence to the contrary.[3] Rather, its case depends on what is known as post-sale confusion--viewers who have an interest from the standpoint of the original creator's reputation and may be misled. Chrysler introduced persuasive evidence that the Viper added greatly to its general reputation, quite apart from sales. Infringers who do a poor job mechanically, or introduce differences that detract, but do not change the apparent origin, were recognized by Congress in enlarging the statute. See Roberts, 944 F.2d at 1244-45. In disregard of Fed.R.Civ.P. 52(a), this confusion was not mentioned, let alone discussed by the court, although it was part of Chrysler's main case and was adequately supported by expert testimony.[4] We see no possible fair resolution of this basic inadequacy short of giving Chrysler a whole new trial, to be before a new judge because of the extensive interlocking of the evidence.
 
 
 25
 This brings us to Silva's temporary Administratrix entering the case to pursue the appeal from the summary judgment disposing of the counterclaim for taking Silva's design. If Silva's testimony of significant variances by which the Mongoose departed from the Viper is correct, and on which the court ultimately relied, it is hard to see how Chrysler pirated the Mongoose's design. While a party's pleading may be inconsistent, in the last analysis one cannot have it both ways. The court was impressed by Silva's submission and pretrial evidence contrary to the counterclaim, committing himself to inconsistencies, and held him estopped[5].
 
 
 26
 We are not moved by Silva's explanations; particularly not by the use he made of the fact that initially he was without counsel, and we are much troubled by his charging Chrysler with making "an especially egregious misstatement of fact" in saying his answers to interrogatories were under oath when they were unsigned. Silva fails to mention that in his deposition, obviously under oath, he agreed to their correctness.
 
 
 27
 The judgment dismissing the complaint is reversed; Chrysler to have a new trial. The judgment for Chrysler on the counterclaim is affirmed, with leave to the succeeding judge to reconsider if so minded. Costs to Chrysler.
 
 
 
 [1]
 This went to judgment on December 14, 1995
 
 
 [2]
 The single Mongoose is currently in the hands of Chrysler who received it from another original defendant, Leonard Legere, who purchased it from Richard Galardi who received it from Ronald Torlone in satisfaction of amounts due in return for Galardi's construction of the mechanicals for the car. While Chrysler has possession of the Mongoose apparently as part of a consent decree with Legere, Galardi retains title to the vehicle because Legere defaulted on his payments
 
 
 [3]
 We devote a footnote to the court's giving weight to its finding that Silva did not intend to copy. Strictly, intent, or lack thereof, does not affect the eyes of the viewer. See Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir.1986). Proof of bad intent may, psychologically, hurt as an admission. Proof of good intent does not change appearance
 
 
 [4]
 The court did give some attention to Chrysler's expert during trial. "I was ... not paying too much attention to the cross-examination, but the last question was a good one, it woke me up."
 
 
 [5]
 The district court found in relevant part:
 Defendant Silva repeatedly made judicial admissions negating his misappropriation counterclaim, and, thus, is estopped from raising said claim at this time. The Defendant Silva repeatedly conceded in pleadings and other papers filed with this Court that his vehicle is "significantly different" than the Viper and was based on design elements in the public domain.