USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1926 CHRYSLER CORPORATION, Plaintiff, Appellant, v. JOHN C. SILVA, JR., d/b/a J.C. SILVA DESIGNS, Defendant, Appellee, _____________________ No. 95-1927 CHRYSLER CORPORATION, Plaintiff, Appellee, v. JOHN C. SILVA, JR., d/b/a J.C. SILVA DESIGNS, Defendant, Appellant, _____________________ No. 96-1231 CHRYSLER CORPORATION, Plaintiff, Appellant, v. JOHN C. SILVA, JR., d/b/a J.C. SILVA DESIGNS, Defendant, Appellee. ____________________ ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ____________________ Before Cyr, Circuit Judge, Aldrich and Campbell, Senior Circuit Judges.  ____________________ Jerre B. Swann with whom Kilpatrick & Cody, Robert B. Cultice, Goldstein  &  Manello,  Eric M. Dobrusin, and Harness, Dickey & Pierce were on brief for Chrysler Corporation. Anthony M. Fredella with whom Fredella & Wheeler was on brief for John C. Silva, Jr. ____________________ July 9, 1997 ____________________ ALDRICH, Senior Circuit Judge. This is an unusual case  that  goes  back  a  long while, including a four year history prior to suit. Plaintiff Chrysler Corporation ("Chrysler") filed suit in the Massachusetts District Court in July 1991, under  the  Lanham Act, 15 U.S.C. SS 1051 et seq., for trademark infringement, specifically trade dress, against John C. Silva, Jr.  ("Silva"), and a number of other individual defendants who have settled out. At issue was Chrysler's allegation that Silva copied Chrysler's innovative "muscle car," the Dodge Viper. Silva counter-claimed, alleging that the shoe was on the other foot; that Chrysler was the one at fault, having stolen  the  allegedly  infringed design from him. On December 9, 1993 the court, in a separate brief memorandum, ordered summary judgment for Chrysler on the counter-claim on the ground of estoppel.1 The  first  of  Chrysler's  demands was for a preliminary injunction  against  violation. This was denied, and ultimately, after a bench trial, the court dismissed Chrysler's complaint with  a  memorandum  of  findings. This was initially done on July 19,  1995.   On  August  4  Chrysler moved to amend the findings and to alter or amend the judgment, or, alternatively, for a new trial. The court took additional testimony and on January 9, 1996  it  again entered judgment for defendant on the complaint. Both parties appealed. We affirm in part. 1. This went to judgment on December 14, 1995. -3- Just prior to oral argument before us, Silva died. At  the  argument  date  his  (former) counsel appeared, saying that he had no client. On his stating that his argument was ready we said we would hear the oral arguments of both sides and reproduce  them for the files. This has been done. We further stated that we would afford time for an administrator to be appointed for Silva and move to continue the case, if so minded. This, too, has been done. One Jeanne A. Silva, temporary administratrix of the estate of John C. Silva, Jr., has  been  substituted for the deceased Silva in all capacities. We continue with the appeals. I. Facts It is, of course, well known that there is enormous competition that depends upon the body appearance of automobiles.   It  is  not  so well known that this is so important to true enthusiasts that custom builders make, or order made, special  bodies to place over a standard chassis. This art can produce problems. See, e.g., Ferrari S.P.A. Esercizio v. Roberts, 944 F.2d 1235, 1244-45 (6th Cir. 1991). In 1988, spurred on by a conversation between its executives the previous year, Chrysler considered designs harking back, in part, to 1960's roadsters. A prototype was completed  in  time  for  the January 1989 International Automobile Show  in  Detroit. Here the reception was so good that Chrysler formed TEAM VIPER. By December 1991, it had four production -4- units and in 1992 it produced 200 Vipers. It had spent approximately $8,000,000 to promote this vehicle and over $75,000,000 to bring it into production. It attracted a special class of buyers. During the trial, as a defense to the infringement claim, Silva testified that he had contacted Chrysler by mail in October 1987 and offered it the opportunity either to purchase  his  design for a car Silva had dubbed the "Mongoose," for  which  he  included sketches with his letter, or to contract with him to build a show car based on the design. He claimed that past experience in building cars for large manufacturers instilled in him the necessity of clearly marking the designs with proprietary statements of ownership and confidentiality before  forwarding  them  to Chrysler. He also included a request that the sketches be returned if Chrysler was not interested. He  received  no  response  to his letter and the sketches were not returned. In early 1989, Ronald Torlone, one of the original defendants, decided he wanted a "new look" for his 1979 Chevrolet Corvette. For this he retained a builder, Motor Incorporated, for which Silva worked as an independent contractor. They and another original defendant, Richard Galardi,  produced the Mongoose.2 Also in 1989, after seeing a 2. The single Mongoose is currently in the hands of Chrysler who received it from another original defendant, Leonard Legere, who purchased it from Richard Galardi who received it -5- picture of Chrysler's prototype for the Viper, Silva called Chrysler and eventually spoke with an in-house attorney who, after learning of the Mongoose, demanded that Silva stop work and  destroy  the vehicle. Silva refused, Chrysler brought this suit and Silva counterclaimed for the theft of his design. II. Analysis Section  43(a)  of  the  Lanham Act, 15 U.S.C. S 1125(a), provides protection against: (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation  of origin, false or misleading description of fact, or false or misleading representation of fact, which -- (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,  connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . . 15 U.S.C. S 1125(a). In  1992,  the  Supreme  Court held that S 43(a) extended to  claims  for infringement of trade dress. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 770 (1992). Trade dress has been defined as "the design and appearance of [a] product from Ronald Torlone in satisfaction of amounts due in return for Galardi's construction of the mechanicals for the car.  While Chrysler has possession of the Mongoose apparently as part of a consent decree with Legere, Galardi retains title to the vehicle because Legere defaulted on his payments. -6- together with the elements making up the overall image that serves to identify the product presented to the consumer." Fun-Dametal Too, Ltd. v. Gemmy Indus., 111 F.3d 993, 999 (2d Cir. 1997) (internal citation omitted). In order to warrant protection, trade dress must be either inherently distinctive or  have  become  so  by  acquiring a secondary meaning. Two Pesos, 505  U.S.  at  769. Inherently distinctive trade dress cannot be functional, and to prevail on a claim of infringement, the defendant's  product  must  have created a likelihood of confusion with  regard  to its source. See id.; Tec Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996). The  court  found  that  the  Viper "had acquired inherent distinctiveness  through  secondary meaning, that the trade dress was 'non-functional,'" and therefore entitled to trade dress protection,  but  that  Chrysler failed to prove the likelihood of confusion between the two cars. It made several individual findings of fact. Relevant ones include: 11. Mr. Silva saw and/or read the press coverage of the Viper concept car in the Spring and Summer of 1989. * * * 13.  Photographs of the Dodge Viper concept car served as the starting point for the car body designed by Mr. Silva for Mr. Torlone. 14. Mr. Silva made significant modifications to the design of the Dodge Viper in his creation of the car body, including, but not limited to: the windshield; the rollbar; the nose area; -7- the wrap-around area of the mirrors; and the cut lines. 15. Mr. Silva did not intend to duplicate or otherwise copy the Dodge Viper. With these findings in hand, the court moved to the test  for  likelihood of confusion, consisting of eight relevant factors, see Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 3 (1st Cir. 1993); Boston Athletic Ass'n v. Sullivan ,  867 F.2d 22, 29 (1st Cir. 1989), and determined that each party was entitled to prevail on four, as follows: 1. Similarity of the marks (dress) - Chrysler 2. Similarity of goods - Chrysler 3. Channel of trade - Silva 4. Channel of advertising - Silva 5. Class of prospective purchaser - Silva 6. Evidence of actual confusion - Chrysler 7. Defendant's intent in adopting the dress - Silva 8. Strength of the dress - Chrysler. On this basis, unless Silva prevails because of his lack of bad intent in adopting Chrysler's dress, it is difficult to understand why Chrysler, who prevailed here on similarity  and strength of dress, should lose its case, it not being necessary, since the Lanham Act's amendment, to prove purchaser confusion, post. Beyond this seeming inconsistency -8- it is hard to explain how the court could say, "[T]he Court rules, as a matter of law, that plaintiff did not establish a likelihood of confusion between its vehicle and the Silva vehicle." (emphasis supplied.) If the court meant matter of law, it was clearly wrong. There were ample lay witnesses, notably the other original defendants, expressly mentioned by the  court,  whose evidence precluded ruling as a matter of law in Silva's favor. Study  of  its  opinion as a whole leads us to conclude that  the  court really meant "find," or "conclude," and we will so address its decision. Chrysler says, as it must, Aktiebolaget  Electrolux ,  that such a finding was plainly wrong. A  substantial part of the court's opinion is devoted to listed factors 3, 4 & 5, ante, concluding that purchasers would not be confused or misled. Chrysler concedes this; indeed it offered no evidence to the contrary.3 Rather, its case  depends  on  what  is  known as post-sale confusion -- viewers who have an interest from the standpoint of the original creator's reputation and may be misled. Chrysler introduced persuasive  evidence  that  the Viper added greatly to its general reputation, quite apart from sales. Infringers who do a poor 3. We devote a footnote to the court's giving weight to its finding that Silva did not intend to copy. Strictly, intent, or lack thereof, does not affect the eyes of the viewer. See Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986). Proof of bad intent may, psychologically, hurt as an admission. Proof of good intent does not change appearance. -9- job  mechanically,  or  introduce differences that detract, but do not  change  the apparent origin, were recognized by Congress in enlarging the statute. See Roberts, 944 F.2d at 1244-45. In disregard of Fed. R. Civ. P. 52(a), this confusion was not mentioned, let alone discussed by the court, although it was part of Chrysler's main case and was adequately supported by expert  testimony.4 We see no possible fair resolution of this basic  inadequacy  short  of giving Chrysler a whole new trial, to be  before  a  new judge because of the extensive interlocking of the evidence. This brings us to Silva's temporary Administratrix entering the case to pursue the appeal from the summary judgment disposing of the counterclaim for taking Silva's design.   If  Silva's  testimony of significant variances by which the Mongoose departed from the Viper is correct, and on which the court ultimately relied, it is hard to see how Chrysler pirated  the  Mongoose's  design. While a party's pleading may be inconsistent, in the last analysis one cannot have it both ways. The court was impressed by Silva's submission and pretrial evidence contrary to the counterclaim, committing himself to inconsistencies, and held him estopped5. 4. The court did give some attention to Chrysler's expert during trial. "I was . . . not paying too much attention to the cross-examination, but the last question was a good one, it woke me up." 5. The district court found in relevant part: -10- We are not moved by Silva's explanations; particularly  not by the use he made of the fact that initially he was without counsel, and we are much troubled by his charging Chrysler with making "an especially egregious misstatement  of fact" in saying his answers to interrogatories were under oath when they were unsigned. Silva fails to mention  that  in  his  deposition, obviously under oath, he agreed to their correctness. The judgment dismissing the complaint is reversed; Chrysler  to  have  a  new  trial. The judgment for Chrysler on the counterclaim  is  affirmed, with leave to the succeeding judge to reconsider if so minded. Costs to Chrysler. Defendant Silva repeatedly made judicial admissions negating his misappropriation counterclaim, and, thus, is estopped from raising said claim at this time. The Defendant Silva repeatedly conceded in pleadings and other papers filed with this Court that his vehicle is "significantly different" than the Viper and was based on design elements in the public domain. -11-