WINNER INTERNATIONAL
LLC, Plaintiff,

v.

OMORI ENTERPRISES, INC., Super
Lung, Inc., Xin Xihu Investment &
Co., Ltd. and Jun Wang, Defendants.

No. 99 CV 1475.

United States District Court,
E.D. New York.

Aug. 20, 1999.

Camhy Karlinsky & Stein LLP, (Tal B. Marnin, Kenneth A. Lapatine, of counsel), New York City, for plaintiff.

Michael Phillip Berkley, P.C., (Michael Phillip Berkley, of counsel), Garden City, New York, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff brought this .action for unfair competition and trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), unfair competition and trade dress infringement under New York General Business Law §§ 349, 350, and 368–d, and injury to business reputation and trademark dilution pursuant to state and federal common law.

Plaintiff is the maker of auto anti-theft devices that attach to a motor vehicle's steering wheel so as to inhibit it from moving. Plaintiff markets the devices under such trademarks as "The Club," "The Super Club," "The Ultra Club," "The Premier Club," and "The Club LX" (collectively "The Club"). The price tag on The Club that plaintiff submitted to the court says $39.99.

Defendants market "Global America Steering Wheel Lock" ("Global America"), which closely resembles The Club and performs the same function. Defendants' ·

product sells at a price of about $10 to $19, markedly lower than that of plaintiff's product.

The court has jurisdiction pursuant to 28 U.S.C. § 1338(a), giving federal courts jurisdiction over, among other matters, trademark cases, and 28 U.S.C. § 1338(b), providing jurisdiction over a claim of unfair competition when joined with, among other claims, a substantial and related trademark claim.

Plaintiff has moved for a preliminary injunction immediately to restrain defendants from manufacturing, selling, distributing, disseminating, and advertising Global America.

Plaintiff claims (1) Global America's trade dress, specifically its shape, red and black color combination, and its packaging, constitute unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) and the New York General Business Law §§ 349, 350 and 368–d; (2) defendants' false and deceptive marketing practices violate the New York General Business Law §§ 349, 350 and 368–d; and (3) defendants' use of confusingly similar trade dress and packaging constitute (a) unlawful dilution of the trademark "The Club" and its trade dress, (b) unfair business practice, and (c) false advertising pursuant to federal and New York law.

### I.  The Competing Products

The record shows, in substance, the following.  Plaintiff is the market leader in automobile anti-theft devices and has been marketing The Club since April 28, 1986, advertising the device on television, in newspapers, on radio, and in direct consumer mailings. The Club is sold in stores nationally and internationally, with gross sales and gross advertising expenses exceeding $649,276,000 and $195,109,000 respectively.

The Club, as displayed in its package, consists of a metal rod covered in vinyl, red in color, about one foot, eight and a-half inches long but adjustable in length, with a hook attached or molded off to the right side of the top of the device, and an upside-down hook attached or molded off to the right side of the middle.  Just above the middle hook is a black lock mechanism, with a "W," presumably a logo for the company's name, Winner, emblazoned above the lock.  On the side of the red rod is the "The Club" in black letters.  On the bottom of the device is a black plastic grip with undulating grooves on the side, suggesting finger-placement.  Plaintiff says the grooved plastic grip at the base makes the device look like a club, and hence the name.

The packaging for The Club consists of an outer clear plastic package, a cardboard insert, and a hole at the top to hang the product on display.  The cardboard is predominantly gold, with a black band at the top and the bottom.  "The Club" is in one and a-quarter inch lettering in gold at the top.  A picture featuring The Club in red, with "The Club" clearly visible in black letters, attached to a steering wheel of a vehicle in black-and-white, appears in the upper part of the front of the package.

The product claims on the front and back of the package are written in English and French.  Included in the written claims on the front of the package is a white starburst at the top that says, in red lettering, "Police Say 'Use It'." Also at the top is the slogan "Guaranteed up to $500," with $500 in bright red.  In the middle under the heading "The Club" is a list of the product's features:

- Highly Visible
- Tough to defeat
- No false alarms
- Field tested
- Easy to use
- Police tested
- Police recommended
- Unbeatable Protection
- Guaranteed up to $500.00 towards deductible.

See back for details.

At the bottom are endorsements, in small gold lettering, from policemen and *Autotech Magazine.*

The back of the package includes written instructions and diagrams on how to use the device, along with an explanation of the guarantee. Additionally there is a sketch of the device, with its various features listed with arrows pointing to their location on the device. Over the sketch it says "The Club," "The Original . . .," and below it says "Ask For The Club By Name", "Fully Guaranteed, Details Inside." The keys to the device are visible on the back enclosed in clear plastic. At the very bottom in small print appears "Winner International Corp."

Plaintiff sells The Club in color combinations other than red and black, but ninety-percent of its sales are in the red and black product. It is this color combination of red and black that is chiefly at issue.

Defendants sell the Global America steering wheel lock primarily to Strauss Auto Discount Stores and in flea markets with total revenues of about $162,500 and an advertising investment of about $1200. In Strauss Auto Discount Stores it lists for $19 but is usually sold at a sales price of $10. The Club sells at Strauss for a price of $39.99.

The general manager of Strauss says that The Club products are sold together in their own "planogram," apparently a separate display structure, and not grouped together with Global America or other competing products.

Defendants' device, as displayed in its package, consists of a metal rod covered in vinyl, red in color, about one foot, seven inches long but adjustable in length, with a u-shaped prong centered at the top of the device and a hook—in the shape of a partial "u" jutting off to the right side of the middle of the rod. Above the middle hook is a black lock mechanism. In black letters on the red rod facing the front of the package, is the name "Global America." On the bottom is a black plastic grip with raised bumps. The name "Global America" is etched onto the grip, facing the front of the package.

The packaging of Global America consists of an outer clear plastic package, a cardboard insert, and a hole at the top to hang the product on display. The cardboard is completely black. The name "Global America," in dim gold, appears twice on the top of the cardboard insert and in one and a-quarter inch lettering sideways to the left of the device. There is a picture of a car towards the top of the insert, with the following list of features underneath, in English only:

- Easy to Use
- High Visibility
- Maximum Protection
- 3(4) Way Keys for High Security
- Tough Hardened
- Vinyl Coated to protect against damage to car.

There is a dimly lit picture of the device on a vehicle's steering wheel, and the keys are visible from the front of the package enclosed in clear plastic.

The back of the package has instructions for use, in English and French, with two small black-and-white photographs, one showing the device fully on the steering wheel and one showing it either half-on or half-off. The name "Global America" appears twice at the top and twice at the bottom. "Omori Enterprises Inc." appears in small print at the bottom.

Defendants also sell their device in color combinations other than red and black, but admit that "they don't sell," meaning that consumers do not prefer the product in other colors.

## II. Legal Criteria

To obtain a preliminary injunction, a plaintiff must show (1) likelihood of irreparable harm should the injunction be denied and (2) either (a) likely success by plaintiff on the merits or (b) sufficiently serious questions going to the merits and a

balance of hardship tipping decidedly in the plaintiff's favor. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). A preliminary injunction is an extraordinary remedy and not granted routinely.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides, in pertinent part, for a private cause of action against any person who:

> in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person....

15 U.S.C. § 1125(a).

■ The Lanham Act, enacted to protect both consumers and trademark owners, is designed to ensure that consumers purchasing a product may be confident of getting the brand they think they are getting, to reduce the customer's cost of shopping and making purchasing decisions, and to inhibit pirates from misappropriating the goodwill of the manufacturers. *See Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1068 (2d Cir. 1995); *Qualitex v. Jacobson Products Co. Inc.*, 514 U.S. 159, 163–64, 115 S.Ct. 1300, 1303, 131 L.Ed.2d 248 (1995). But the Lanham Act must be construed in the light of the strong federal policy in favor of vigorously competitive markets, as exemplified by the anti-trust laws. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379 (2d Cir.1997).

Section 43(a) applies equally to trademark and trade dress claims. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615 (1992).

■ In order to prove trade dress infringement, plaintiff must show (1) that its dress is inherently distinctive or has acquired a secondary meaning, and (2) that the requisite likelihood of confusion as to source or sponsorship exists between plaintiff's dress and defendants'.

■ A trade dress need not have widespread recognition among consumers to be distinctive. It need only serve to identify a product as emanating from a particular, although possibly anonymous, source. *See Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997).

The Second Circuit has divided trade dress cases into two kinds, package design and product configuration. *See Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1007 (2d Cir.1995); *Fun–Damental Too*, 111 F.3d at 1000.

A package design trade dress is a broad concept made up of the design and appearance of the product together with "all the elements making up the overall image that serves to identify the product presented to the consumer ... includ[ing] the appearance of labels, wrappers and containers used in packaging [the] product as well as displays." *Fun–Damental Too*, 111 F.3d at 999.

A product configuration trade dress consists of the product's features or design rather than the packaging associated with the product. The distinctiveness of a product design is determined by asking "whether the design [is] likely to be understood as an indicator of the product's source." Trade dress protection for product configuration is more difficult to obtain than for package design. *See Samara Brothers, Inc. v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 125 (2d Cir.1998).

Product configuration is generally the focus for cases involving products sold without a package, or with just a label, such as furniture or clothes. *See, e.g., Samara Brothers*, 165 F.3d 120 (garment design); *Knitwaves, Inc., v. Lollytogs, Ltd.*, 71 F.3d 996 (2d Cir.1995) (motif on children's sweaters); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir.1997) (furniture design). But

where infringement of product configuration is specifically alleged, it has been considered for packaged products as well. *See, e.g., Nabisco, Inc. v. PF Brands, Inc.,* 50 F.Supp.2d 188 (S.D.N.Y.1999) (shape of "Goldfish" crackers).

Plaintiff's complaint and its motion for a preliminary injunction describe the trade dress at issue as the product and its packaging.

The court concludes that the overall look of The Club within its clear plastic package compared to Global America in its clear plastic package is the appropriate focus of inquiry. *See Fun–Damental Too, Ltd.,* 111 F.3d at 1001 (looking at product in context of packaging is proper method of analyzing open-style packaging for trade dress protection); *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 743 n. 5 (2d Cir.1998) (choosing to analyze packaging trade dress rather than product configuration for bottled water).

### A. Inherent Distinctiveness

■ Trade dress for package design may be classified on a spectrum of increasing distinctiveness as (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *Paddington Corp. v. Attiki Importers & Distrib., Inc.,* 996 F.2d 577, 583 (2d Cir.1993) (applying *Abercrombie* classifications to packaging).

A mark is generic if it refers merely to "the genus of which the particular product is a species." *Abercrombie & Fitch Co.,* 537 F.2d at 9. A descriptive mark describes the nature of the product. A suggestive mark uses names in a creative way to suggest the nature of the product. It requires purchasers to use "imagination, thought and perception to reach a conclusion as to the nature of the goods." *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985). Fanciful or arbitrary marks are those invented solely for trademark usage. They are marks that do not describe or suggest the nature

or qualities of the product and are given the greatest protection. *See, e.g., Exxon Corp. v. Xoil Energy Resources, Inc.,* 552 F.Supp. 1008, 1014 (S.D.N.Y.1981) (holding that "Exxon" is an arbitrary trademark).

■ Trade dresses that are suggestive or arbitrary are inherently distinctive. A descriptive trade dress may be distinctive if it has acquired a "secondary meaning" giving it distinctiveness to the consumer. *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. at 2757–58. A generic trade dress is ineligible for protection.

■ Plaintiff says that The Club's trade dress is arbitrary and distinctive. A product's distinctiveness is based on the way the trade dress appears to the observer when viewed as a whole. Individual aspects of the dress may be generic, but as long as the overall combination of the design is likely to identify the particular source of a product, its total impression is inherently distinctive. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995). As the producer has "almost unlimited" choices among the possible ways it can present its product, "typically a trade dress will be arbitrary or fanciful and thus inherently distinctive, and the only real question for the courts will be whether there is a likelihood of confusion between the products, ... provided, of course, the trade dress is not functional." *Paddington Corp.,* 996 F.2d at 583.

The Club's clear plastic wrapper and cardboard insert, with a hole at the top for hanging are common features of products packaged for store display.

■ But the presence of The Club trademark prominently displayed in large letters on the top of the package as well as in smaller type in numerous other locations on the front and back of the package, as well as on the device itself, along with other prominent features such as the bright gold cardboard backing, the white sunburst with the police endorsement, and the full u-shaped hooks set to one side,

indicate a distinctive package having a particular source.

Looking at the overall appearance of plaintiff's product together with its package, the court finds that the combination of elements in plaintiff's trade dress creates an "arbitrary" package design capable of identifying the product with a particular source. The Club's package design trade dress is thus inherently distinctive, and the court proceeds to an analysis of likelihood of confusion without considering secondary meaning.

### B. Likelihood of Confusion

■ The existence of the requisite likelihood of confusion as to source or sponsorship between two trade marks is determined by applying the factors described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961). Those factors are: (1) the strength of the prior owner's mark; (2) the similarity between marks; (3) the proximity of the products; (4) the likelihood that the prior user will bridge the gap; (5) actual confusion as to source or sponsorship; (6) the defendant's good faith; (7) the quality of defendant's product; and (8) the sophistication of the buyers. These factors are not exclusive and the test makes no single factor dispositive. The court "weigh[s] each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 571 (2d Cir. 1993).

The same considerations are applied to determine likelihood of confusion as to source or sponsorship between trade dresses. *See, e.g., Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1043 (2d Cir.1992).

In this case where the products are in direct competition with each other, the third *Polaroid* factor, proximity of the products, is obvious. The fourth, likelihood that the gap will be bridged, is not relevant. *See Bristol–Myers Squibb*, 973 F.2d at 1044. Plaintiff has not submitted

evidence as to the eighth factor, the sophistication of the buyers. But the fact that The Club sells for a price that is markedly higher than that of Global America suggests that consumers may give extra attention to the differences in trade dress between the two products. The court analyzes the remaining factors in turn.

### (i) The strength of plaintiff's trade dress

A trade dress's strength is measured by both its conceptual and commercial strength. *See W.W.W. Pharm. Co.*, 984 F.2d at 572.

The conceptual strength is determined by the degree to which a trade dress is distinctive. *Id.* The Club and its packaging, considered as a whole, is an "arbitrary" trade dress and thus inherently distinctive.

The commercial strength of a trade dress is measured by the degree to which it is distinctive in the marketplace. The commercial success of a product reinforces the dress's strength. *See Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987).

The Club has enjoyed considerable commercial success since its introduction in 1986, and is the industry leader in steering wheel locking devices. Its commercial success and national and international advertising campaigns has made The Club's trade dress strong, and thus distinctive.

### (ii) Comparison of trade dresses

The court considers whether the similarities in The Club and Global America's trade dresses are likely to confuse an appreciable number of ordinarily prudent purchasers as to the source of the products.

The relevant inquiry is not how many details the two products share. It is whether the similarities create the same general, overall impression such as to make likely the requisite confusion among

the appropriate purchasers. *Cumberland Packing Corp. v. Monsanto Company,* 32 F.Supp.2d 561, 569 (E.D.N.Y.1999).

It seems unlikely that a reasonably prudent purchaser would find the overall image of the two products in their packages confusingly similar. They both display their different product names prominently in several places on the front and back of the packages and on the devices themselves.

"The Club" appears in large, bright gold letters on the top of its package, and in at least eighteen other places, in English and French ("Le Club"), as well as in English on the side of the device itself. "The Club," as industry leader, has a high recognition rate among consumers and thus its name is a powerful source identifier.

"Global America" appears in large, dull gold letters along the side of the package, in medium letters across the top and within a round logo on the top corner, as well as in five places on the back. In addition, "Global America" appears prominently on the device itself.

The conspicuous use of the well-known trade name "The Club" on plaintiff's packaging and of "Global America" on defendants' packaging sufficiently differentiate the two trade dresses. *See Bristol–Myers Squibb Co.,* 973 F.2d at 1045–46 (district court's finding that two trade dresses are confusingly similar was clearly erroneous because "the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging").

The other noticeable distinctions between the two products in their packaging are that The Club has a predominantly bright gold cardboard backing, whereas Global America's is completely black. Near the top right of The Club's package is a white starburst with the statement in bright red letters "Police Say 'Use It' ", in French and English; Global America has no starburst and no statements about police endorsements, prominent or otherwise. The Club has a bright red $500 centered toward the top of the package, with the statement "guaranteed up to" in small black letters above it. Global America has no such feature and no mention of a guarantee.

Even the shape of the device, while similar, does have notable differences in appearance. The Club has two full u-shaped hooks jutting off to one side, whereas Global America's u-shaped prong is located directly on top of the rod, suggested a "Y" shape, and it has only a partial u-shaped hook to the side. The black grips are also different. The Club's grip has soft curves, whereas Global America's grip has squared-off, raised bumps.

The court finds that the total images of the trade dresses of The Club and Global America are so different that there is little significant likelihood that prudent purchasers will be confused as to source by similarities in their trade dresses.

Although plaintiff bases its complaint on the trade dress, including the packaging, of the two devices, in its reply brief plaintiff says that infringement has occurred because the product design alone of the two devices, separate from the packaging, is "virtually identical." Plaintiff cites *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1986) for the proposition that post-sale confusion is actionable.

*Lois Sportswear* was a product configuration case in which an infringer used a pattern identical to Levi Strauss' trademarked stitching pattern on the back of jeans. The Second Circuit's concern in *Lois Sportswear* was that, although the label may prevent customer confusion at the point of sale, consumers would be confused as to the source of the infringing jeans when they see people wearing the jeans in public, without the labeling, and this may influence their future buying decisions.

For reasons already stated, the premise for plaintiff's argument is false. The trade dresses at issue are the products in their packages. Even if the court were to consider the products' designs on their own, the two products are by no means virtually identical. In addition, because the name "Global America" is prominently printed directly on the front of defendants' device and cannot simply be discarded like a label, there is little or no likelihood that potential customers seeing the device attached to steering wheels would be confused as to its source.

### (iii) Alleged actual confusion

To establish likelihood of consumer confusion, plaintiff relies on a survey conducted by its expert, Mark K. Lefkowitz, who concluded that sixty-seven percent of the respondents associated defendants' device with The Club and thirty percent associated it with Global America. Because of significant flaws in the survey, the court finds that it is insufficient to support a finding of actual confusion.

The survey conducted one-hundred and fifty interviews of people at various shopping malls in April of 1999. The "universe" of consumers was defined as men and women who

(a) were 18 years of age or over;

(b) have an automobile of their own, or drive an automobile that their spouse or some other household member owns;

(c) purchased an anti-theft device for an automobile (either one that they currently own or one they used to own), or are likely to purchase an anti-theft device for an automobile within the next twelve months, other than an alarm system;

(d) have no one in their household currently employed by a market research company, advertising agency, or a company that provides automotive products.

The survey asked eight screening questions designed "to determine on a visual level whether the respondent associated the Global America with a particular source or brand." The people interviewed were shown the Global America device in its packaging, but were not shown The Club. After they had time to view it, the product was taken away and they were asked: "What was the name of the product you just saw?" If the person identified the device as The Club, the respondent was considered "a person who confused the Global America with The Club." Forty-five percent of the sample surveyed identified defendants' device as The Club, while twenty-seven percent named the product Global America.

If the person identified the product as Global America or by another product name, those respondents were asked: "What company do you think makes this product?" Those who said the manufacturers of The Club were considered persons who "likely attributed and confused the manufacturer of The Club as the source of the Global America." Six percent of the respondents identified defendants' product as manufactured by the makers of The Club.

The respondents who mentioned a name other than The Club to the above question were then asked: "Do you think the company that makes this particular product also makes other products?"

If the respondent answered "yes," he or she was then asked: "What are the names of other products they make?" Six percent of those respondents identified The Club as part of the line manufactured by a single source.

If the respondent mentioned a name other than The Club, he or she was then asked: "Do you think the company that makes the product you just saw needed to obtain permission from another company in order it make it?"

The people who answered "yes" were then asked: "From what company did they need permission in order to make this product?" Ten percent of the respondents identified the maker of The Club as the

entity from which the makers of Global America were required to obtain permission.

Mr. Lefkowitz broke down the responses as follows:

- Forty-five percent of respondents identified defendants' device as The Club.
- Twelve percent of respondents said that defendants' device was made by the same company that makes The Club.
- Ten percent said that the company that makes defendants' product needed to obtain permission to make it from The Club.
- Twenty-seven percent identified defendants' device as Global America.
- Three percent said the device was made by Global America or the same company that makes Global America.

The most significant flaw in this study is that it has nothing to do with trade dress. There is no way to tell whether those who answered "The Club" responded that way because "The Club" has become a generic name for steering wheel locking devices, because they do not know The Club has competitors, because they simply guessed at the name because it is a famous brand, or because the trade dress—the way the product was presented in the package— was confused with that of The Club. In other words, there is no way to determine whether respondents answered "The Club" for non-trade dress reasons. *See Cumberland Packing Corp. v. Monsanto Company*, 32 F.Supp.2d 561, 572–74 (E.D.N.Y. 1999).

The survey is also unreliable, among other reasons, because the manner in which it was conducted did not resemble actual market conditions. *Id.* at 575. Although The Club products are not sold on the same shelf as the Global America products, they are nearby. In an actual store that sells both The Club and Global America, a consumer could view both trade dresses before making a buying decision.

Given the prominence of the trademarks on both packages, the well-known name The Club, and the up to thirty-dollar price difference, it is unlikely that confusion would arise.

In addition, defendants have claimed that their use of the color red on their product and the general shape of their device serve a functional purpose. Yet the survey does not elicit from those allegedly confused persons interviewed the extent to which their confusion was based on color or shape. To be meaningful a survey should show the reason that each interviewee found confusion. *See Cumberland Packing Corp.*, 32 F.Supp.2d at 572–77.

The Supreme Court has held that "sometimes" a color, for example "a color that in context seems unusual," will meet the ordinary legal trademark requirements. *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 161, 163, 115 S.Ct. 1300, 1302, 1303, 131 L.Ed.2d 248 (1995). If the sole or primary reason the survey interviewees who, plaintiff says, confused the two products, did so solely or primarily because of the red color, then the court would be faced with the question of whether, in the present context, the Lanham Act countenances granting a virtual monopoly to plaintiff over such a primary color as red. As the Supreme Court recognized in *Qualitex*, the functionality doctrine prevents trademark law from "inhibiting legitimate competition by allowing a product to control a useful product feature." 514 U.S. at 164, 115 S.Ct. at 1304.

Red is hardly an "unusual" color in the context of security devices. That color, in traffic lights, stop signs, and other warnings, as well as in fire trucks, is used to alert and warn. It may be that it will serve better than yellow, pink, or blue to warn and deter some potential car thieves.

If a color has an effect beyond identifying the source or reputation of the product and provides some additional utility to the product or increases its efficacy it would appear to qualify as functional. The same

may be said of the basic shape of the device, a rod with two prongs. To preclude the basic shape may prevent healthy competition in the pertinent field of steering wheel security devices.

The evidence before the court does not enable the court to resolve all these matters. They can only be decided on a fuller record, including perhaps an evidentiary hearing.

### (iv) Defendant's intent

Plaintiff claims that defendants in adopting its trade dresses intended to capitalize on plaintiff's reputation and goodwill.

■■■ Where a party acts in bad faith and intentionally copies a trademark or trade dress, the court can draw an inference that there is likelihood of confusion. *See Paddington Corp. v. Attiki Importers & Distrib., Inc.,* 996 F.2d 577, 586–87 (2d Cir.1993). But defendant's knowledge of a plaintiff's trade dress need not give rise to an inference of bad faith. "[A]doption of a trademark with actual knowledge of . . . a very similar mark may be consistent with good faith." *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 584 (2d Cir. 1991). Even if the defendants had copied plaintiff's trade dress, "bad faith should not be inferred simply from the act of copying." *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1005 (2d Cir.1997). "[C]opying in order to market a functionally equivalent alternative product might well benefit consumers, which is one of the aims of the Lanham Act." *Id.* at 1005, *citing* Andrew C. Finch, "When Imitation is the Sincerest Form of Flattery: Private Label Products and the Role of Intention in Determining Trade Dress Infringement," Comment, 63 *U.Chi. L.Rev.* 1243, 1255 (1996).

Plaintiff has offered no substantial evidence of defendants' bad faith. All it refers to are the asserted similarities in trade dress. This is not a case of defendants trying to "pass-off" its product as The Club. Defendants' product is clearly labeled "Global America" in numerous and prominent places on the front and back of the package, and on the body and grip of the device. Defendants' device is not an exact copy of that of plaintiff merely because the prongs and the grip are shaped in a manner approximating, but clearly different from, the counterpart features on The Club.

The fact that the overall appearance of Global America's trade dress is not similar to that of The Club refutes the claim of bad faith.

### (v) Quality of the products

In support of its claim that Global America's device is inferior in quality to The Club, plaintiff submitted a report by its expert, Frank J. Nawalanic, who had both The Club and Global America tested for hardness using the Rockwell Hardness Test.

The Rockwell Hardness Test measures the surface hardness of an object by applying pressure to the object with either a diamond or steel indenter. The depth of the indentation ("the reading") is then measured, and that reading is used to give the object a hardness level on the Rockwell Scale.

Mr. Nawalanic found that The Club had a hardness at the surface of 51.6 on the Rockwell "C" scale, whereas Global America had a reading of what is the equivalent of 9.7 on that scale. At the center The Club measured 22.3 and Global America had a reading of 9.7. Mr. Nawalanic concluded from this data that the surface steel of The Club was "significantly harder" than the steel on the surface and throughout Global America, and that it would be harder for a thief, "at least initially" to cut through The Club than through Global America.

Defendants' expert, Jay I. Siegel, says that, even if the test results were accurate, there is no significant difference in quality between the two products. He says that plaintiff's readings show a difference in

indentation at the surface of only 3/10,-000ths of one inch, and a difference in indentation at the center of just 1/10,000 of an inch.

Mr. Siegel concludes that, as a practical matter, there would be "no material difference in time required to saw through the two rods," and no significant difference in terms of theft deterrence.

On the basis of the evidence presented the court cannot conclude that Global America is of a significantly lower quality than The Club.

*(vi) Conclusion*

■ After considering the pertinent factors and weighing each of them, the court concludes that plaintiff has failed to establish the requisite likelihood of confusion, or a likelihood of irreparable harm by the denial of the motion, sufficient to warrant a preliminary injunction.

Plaintiff's motion preliminarily to enjoin defendants from their allegedly infringing use of The Club's trade dress will be denied.

### III

Plaintiff has also moved for a preliminary injunction under New York General Business Law §§ 368–d, 349, and 350 and "unlawful dilution, unfair business practices, and false advertising pursuant to federal and New York law." Plaintiff offers no evidence or arguments specifically addressed to claims under those laws.

Section 368–d, governing claims of unfair competition and injury to business reputation or of dilution, was repealed on January 1, 1997. The text of section 368–d is now in New York General Business Law section 360–l, and provides that

"[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of

competition between the parties or the absence of confusion as to the source of goods or services."

N.Y.Gen.Bus. § 360–l (West Supp.1999).

Since the standards for unfair competition under New York law is essentially the same as that under § 43(a) of the Lanham Act, and the court will deny plaintiff's Lanham Act claims, a preliminary injunction based on state unfair competition law is unwarranted. *See Safeway Stores, Inc. v. Safeway Properties, Inc.,* 307 F.2d 495, 498 n. 1 (2d Cir.1962); *Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 363 (S.D.N.Y.1998).

■ In order to establish a claim for injury to business reputation or dilution, plaintiff must establish two elements: (1) a distinctive mark capable of being diluted and (2) a likelihood of dilution. *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030 (2d Cir. 1989). Distinctiveness is analogous to the strength of the mark for trademark infringement purposes, *id.* at 1030, and the court has already found that plaintiff has a strong, and thus distinctive, trade dress.

"Dilution" has been defined as "either a blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Mead Data Central,* 875 F.2d at 1031. A prerequisite to a finding of dilution is that the marks are substantially similar. *Nabisco, Inc. v. PF Brands, Inc.,* 50 F.Supp.2d 188, 205 (S.D.N.Y.1999). That standard has been applied to a finding of dilution under federal law as well. *Id.* (applying substantial similarity to dilution under both New York law and Lanham Act § 43(c), 15 U.S.C. § 1125(c), the Federal Trademark Dilution Act of 1995).

Because of the numerous differences between the two trade dresses described above, the court finds that plaintiff has not made the requisite threshold showing of substantial similarity, and thus there is no

likelihood of dilution under either state or federal law.

Section 349 of the New York General Business Law protects against false marketing practices and section 350 prohibits false advertising. The elements of a claim under both sections are that (1) the act or practice was misleading in a material respect, and (2) the plaintiff was injured. *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 828 F.Supp. 1114, 1128–29 (S.D.N.Y.1993), *affirmed*, 32 F.3d 690, 697 (2d Cir.1994).

The problems with the consumer survey that plaintiff submitted have already been discussed, and it is inadequate to show that defendants' product and packaging are misleading. In any event, a preliminary injunction on the basis of false marketing practices and false advertising is unwarranted because plaintiff did not submit any evidence of injury. *Id.*

## V

A preliminary injunction is an extraordinary remedy. Plaintiff has not met its burden to establish likelihood of irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardship tipping decidedly in the plaintiff's favor.

Plaintiff's motion for a preliminary injunction is denied.

So ordered.