**FRUIT–ICES CORPORATION,**
**Plaintiff,**

v.

**COOLBRANDS INTERNATIONAL INCORPORATED, Calip Dairies, Inc., Richard E. Smith and Does 1–8, Defendants.**

**No. 04 Civ. 5218(PKC).**

United States District Court,
S.D. New York.

Aug. 20, 2004.

Laura E. Popp, Patrick T. Perkins, Parick Thierry Perkins, Fross Zelnick Lehrman & Zissu, P.C., New York City, for plaintiff.

Gregg Adam Paradise, Kenyon & Kenyon, New York City, for defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

Plaintiff Fruit–Ices Corporation ("Fruit–Ices"), brings this action against CoolBrands International Inc. ("CoolBrands"), and a number of its related entities, claiming trade dress infringement and unfair competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiff also claims trademark dilution under section 1125(a) and a number of state law unfair competition and dilution claims. Plaintiff now moves for a preliminary injunction based on its section 1125(a) claim, barring defendants from producing and distributing single-serve Fruit–A–Freeze

frozen fruit bars in their current trade dress, which is virtually identical, in plaintiff's view, to its own FrozFruit trade dress.[1] According to plaintiff's submissions, defendants have copied FrozFruit's trade dress and stylized trade name after a third unsuccessful bid to buy the brand, including through the acquisition of its current owner, Fruit–Ices. Plaintiff contends that the substantially identical trade dresses are causing consumer confusion and harm to plaintiff's position in the New York metropolitan frozen impulse bar market in which FrozFruit and Fruit–A–Freeze currently compete.

On August 17, 2004, I held a hearing at which the parties were given the opportunity to present live testimony. At the hearing, each side offered declarations and documentary evidence in support of their claims and defense. ("August 17 Hearing Tr. ("Tr.") 28") The evidentiary record is closed. Set forth below are my findings of fact and conclusions of law. For the reasons set forth below, plaintiff's motion for a preliminary injunction is granted.

*Background*

Fruit–Ices produces a popular frozen confection sold under the name FrozFruit. FrozFruit is an all-natural gourmet fruit bar with chunks of whole fruit that comes in a variety of flavors including: cantaloupe, cherry, lime, lemon, mango, pineapple, tropical, coconut, banana, pina-colada and strawberry, among others. FrozFruit bars are sold both as single-serve items and also in multi-packs. FrozFruit is a leader in the single-serve frozen fruit bar market, known in the industry as the impulse frozen fruit bar market. Multi-pack bars are sold in larger stores and supermarkets. Single-serve impulse bars are typically sold in small convenience stores

and delicatessens, these bars are placed in small freezers and are intended to catch the buyer's eye as they are making their purchases so that they will buy the bars on an impulse. Multi-pack bars are typically purchased for family or household consumption and are kept in the home freezer until served. Single-serve bars are typically consumed within a short distance in space and time from the place of purchase. Impulse bars, including FrozFruit and Fruit–A–Freeze, typically sell for about a dollar; while the exact price of the multiserve pack is not in the record, it is fair to conclude that it is considerably higher. On the basis of the foregoing, I conclude that for the purposes of this motion the impulse frozen fruit bar market is a separate market from the market for the sale of multi-pack frozen fruit bars.

The leading market for impulse fruit bars, and FrozFruit bars' strongest market, is the New York metropolitan area market. (Stein Dep. 84) The New York metropolitan area, as understood in the impulse fruit bar market, is comprised of the territory stretching from southern Connecticut through New York City and into central New Jersey. (Boyle Decl. ¶ 7) According to plaintiff, this is the geographic market in which defendants and plaintiff currently compete.

Since 1998 FrozFruit impulse bars have been sold in the New York market in the same distinctive packaging combining the rainbow FrozFruit logo, comprised of the word "Froz" appearing in blue text with the letters in the word "Fruit" appearing in multi-colored rainbow text with each letter appearing in orange, purple, red, yellow, and green respectively, with other distinctive design elements including: a

---

1. Color photos of the trade dress of the Froz-Fruit impulse bar (Appendix 1) and the Fruit–A–Freeze impulse bar (Appendix 2), as they appear in the New York metropolitan impulse bar market, and a color photo depicting the parties' products side by side in a freezer display case (Appendix 3) are annexed to this opinion.

clear package which allows the consumer to view the 4 oz. bar, stylized pictures of posed fruit marking the flavor of the bar, a yellow banner, placed over the fruit image, announcing, "CHUNKS OF FRUIT" or "REAL FRUIT" (depending on the flavor) in black capital lettering, the banner "GOURMET FRUIT BAR" appearing above the FrozFruit logo in white or blue capital letter text, and the distinctive Froz-Fruit logo appearing at an angle across the clear wrapper. (Edelstein Decl. ¶ 11, Ex. 4) Neither the FrozFruit logo nor the FrozFruit trade dress is federally registered.

Overall retail sales of FrozFruit from 2000 through the first half of 2004 exceed $51.5 million. (Edelstein Dec. ¶ 15) Advertising expenditures for the period of 2001 through the first half of 2004 exceed $4.5 million. (Edelstein Dec. ¶ 17) Plaintiff contends that their advertising efforts along with FrozFruit's distinctive packaging and the quality of the product have made it enormously popular with consumers in the New York metropolitan area, who dash into convenience stores on warm days to buy frozen fruit treats.

Prior to the introduction of the present trade dress, Fruit–A–Freeze had made several failed attempts to penetrate the New York metropolitan area impulse fruit bar market. While Fruit–A–Freeze bars are sold individually in 3–ounce packages on the West Coast and in certain locations in the Southwest, Pacific Northwest and Southeast, the previously packaged 3–ounce Fruit–A–Freeze impulse fruit bar was not a success in the New York area and attempts to market the product were discontinued in 2000. (Stein Dep. 43–46) From 2000 until CoolBrand's recent relaunch of a new and improved 4–ounce Fruit–A–Freeze bar, in a new package with a new logo in July 2004, no Fruit–A–Freeze impulse bar was available in the New York metropolitan area or in the Northeast generally. (Edelstein Dec. ¶ 21) In or around the summer of 2003, CoolBrands introduced in the New York metropolitan area a 4–ounce fruit impulse bar under the Tropicana trademark but the product was unsuccessful and was discontinued. (Stein Dep. 85)

In 2004, CoolBrands attempted to purchase Fruit–Ices and thereby acquire the FrozFruit brand. (Edelstein Dec. ¶ 25) Earlier efforts by defendants to acquire the FrozFruit brand in the late 1980's or early 1990's and in 2000 had proved unsuccessful. (Edelstein Dec. ¶¶ 23–24) The parties began negotiating for the sale of Fruit–Ices in January 2004 but these negotiations met the same fate as the earlier attempts. (Edelstein Dec. ¶ 25)

Talks between the parties broke down in late April 2004, and Fruit–Ices was sold to another entity, Wells' Dairy. (Edelstein Dec. ¶¶ 25–26) During the negotiations, CoolBrands informed Fruit–Ices that they intended to reenter the impulse fruit bar market in the New York metropolitan area, regardless of whether the sale of Fruit–Ices went through, and according to plaintiff, warned that if the sale of Fruit–Ices did not go through things would "get ugly" for Fruit–Ices. (Edelstein Dec. ¶ 25) Of course, CoolBrands' right to enter the impulse frozen fruit bar market in the New York metropolitan area as a potent head-to-head competitor is not challenged on this motion.

Plaintiff asserts that during the beginning of 2004 defendants were working on two separate tracks in order to ensure their successful reentry into the New York impulse fruit bar market. CoolBrands was negotiating to buy Fruit–Ices, while simultaneously attempting to create a product that appeared to the consumer to be virtually identical to FrozFruit. Plaintiff supports this position with the following facts. In February and March of 2004,

while CoolBrands was negotiating with Fruit–Ices for its sale, CoolBrands hired Tailford Associates ("Tailford") to create a new logo and package for their new 4–ounce impulse fruit bar. (Mitchell Dep. 25) CoolBrands successfully markets a 3–ounce impulse fruit bar in California—with trade dress wholly unlike that employed by FrozFruit. Tailford was neither asked to redesign the California packaging nor adapt it to the New York 4–ounce market. Nor did CoolBrands seek to redesign their multi-pack packaging which also differs greatly from FrozFruit and Fruit–A–Freeze's current trade dress in the New York impulse bar market. CoolBrands sought only to introduce packaging for the new single-serve 4–ounce impulse frozen fruit bar.

The design company provided CoolBrands with a number of packaging and logo options for their new impulse bar. The design process stopped and started while the negotiations for the sale of Fruit–Ices was continuing. (Mitchell Dep. 67) Prior to negotiations breaking down, CoolBrands had chosen a logo and package for their new bar that employed some of the same characteristics of FrozFruit's impulse bar packaging but did not replicate the font of FrozFruit's logo or the placement of certain images on the clear wrapper surrounding the product. (Mitchell Dep. Ex. 10) When negotiations reached an impasse, Tailford resumed their work on the new Fruit–A–Freeze packaging and logo. Tailford continued work on the new logo and packaging and received feedback from CoolBrands. Despite the numerous design options open to CoolBrands, it chose the design that most closely mimicked plaintiff's. (Mitchell Dep. Exs. 9, 10)

Plaintiff produced evidence establishing that Tailford and defendants compared their new packaging to FrozFruit's packaging, including an e-mail sent by Mark Mitchell, who worked on the new Fruit–A–Freeze logo and packaging at Tailford, to David Smith at CoolBrands in which Mitchell asked Smith to review the Froz–Fruit and Fruit–A–Freeze impulse bar packages side by side. (Mitchell Dep. Ex. 14) Plaintiffs have also produced another e-mail sent by Mitchell to Smith in which he informs Smith that Fruit–A–Freeze's new logo "matches" the typeface employed by FrozFruit. (Mitchell Dep. Ex. 11) Mitchell claimed that these comparisons were done for the purpose of ensuring that the FrozFruit packaging would not infringe upon the trademark of Fruit–A–Freeze and that a "close" review of the products' packaging highlights their differences. (Mitchell Dep. 75, 94) Plaintiff contends that this comparison was done to ensure that Fruit–A–Freeze's impulse bar logo and package mirrored FrozFruit's impulse bar's trade dress. At his deposition, Mitchell admitted that there were similarities between the new Fruit–A–Freeze packaging and logo and the FrozFruit packaging and logo including: use of a similar typeface for the logo Fruit–A–Freeze, use of a yellow banner with the phrase "Chunks of Fruit", employing a rainbow logo using the same tones and hues as the FrozFruit logo, and that both logos include a word other than fruit appearing in blue while "fruit" appears in rainbow script. (Mitchell Dep.87, 94–96) Mitchell, however, noted several differences including the use of blue lettering, instead of white lettering, for the phrase "strawberry natural fat free" and small differences in the font size and placement of the wording on the package. (Mitchell Dep. 92–93) Mitchell also stated that his review of FrozFruit's label was part of a global review of the market to see what products were in the market and what design elements were successful. (Mitchell Dep. 30-33) When pressed, however, Mitchell admitted that the elements found in other fruit bar packaging did not resem-

ble FrozFruit's packaging to the same degree that the Fruit–A–Freeze packaging did. (Mitchell Dep. 94–96)

FrozFruit became aware of Fruit–a–Freeze's plans to reintroduce a Fruit–A–Freeze impulse bar in or around June 2004. (Edelstein Decl. ¶¶ 27–34) It discovered that Fruit–A–Freeze's packaging used many of the design elements found on FrozFruit's trade dress. In a letter dated June 30, 2004, FrozFruit's counsel advised CoolBrand's President and CEO, David Stein, that it believed that the new design infringed on FrozFruit's logo and trade dress and requested an immediate reply. (Edelstein Decl. ¶¶ 35–37, Ex. 8) In response, on July 6, 2004, CoolBrands' counsel advised that the product was not yet on the market. (Edelstein Decl. Ex. 9) Despite this representation, CoolBrands had begun shipping the new 4–ounce Fruit–A–Freeze impulse bar as early as July 2, 2004. (Edelstein Decl. ¶ 37) The parties agree that the newly designed package has only been shipped into the New York metropolitan area. In some instances, the bars appear side by side in small freezer units in small convenience stores and delicatessens. (Boyle Decl. Exs. 4–5, 6, 6A, 6B, 7) The close proximity and identical designs, plaintiff contends, are leading to consumer confusion and harm to FrozFruit's business and reputation.

*Discussion*

■ To obtain a preliminary injunction plaintiffs must show (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 998–99 (2d Cir.1997). "In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable

harm." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir.1995).

I. *Standard for a Trade Dress Claim Under Section 1125(a)*

■ Section 1125(a), though enacted as part of the Trademark Act, functions as a federal law of unfair competition for unregistered goods and extends protection to a product's trade dress. *Id.* It provides a private cause of action against any person who "in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person ....." 15 U.S.C. § 1125(a). To establish a claim of trade dress infringement under section 1125(a), plaintiff must first demonstrate that its trade dress is either inherently distinctive or that it has acquired a secondary meaning. *Fun–Damental*, 111 F.3d at 999. If it meets that hurdle, it must next show that its trade dress is not functional. *Id.* Finally, the plaintiff bears the burden of demonstrating that there is a likelihood of confusion between the plaintiff's dress and defendants' trade dress. *Id.*

■ In order to determine if there is a "likelihood of confusion," courts look to the *Polaroid* factors which include: (1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) the likelihood that the prior owner will bridge the gap between the products, (5) actual confusion, (6) the defendants' good faith in adopting their own mark, (7) the quality of defendants' product and (8) the sophistication of the buyers. *Polaroid Corp., v. Polarad Electronics. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied* 368

U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Each *Polaroid* factor must be considered in the context of the other factors, and no single factor is dispositive. "Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir.1993).

### A. Distinctiveness of Plaintiff's Trade Dress

■ In order to evaluate the distinctiveness of plaintiff's trade dress, the Court must look to the classifications set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). While normally applying to trademarks, the Second Circuit has noted that the *Abercrombie & Fitch* categories should also inform trade dress classifications. *See Paddington*, 996 F.2d at 583. In *Abercrombie & Fitch*, the Second Circuit laid out the four recognized "categories of terms with respect to trademark protection." 537 F.2d at 9. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Id.* Suggestive and arbitrary or fanciful marks are considered inherently distinctive and therefore always satisfy the distinctiveness prong of a section 1125(a) claim. In contrast, generic marks are unprotectable and descriptive marks require a showing of secondary meaning. *Jeffrey Milstein*, 58 F.3d at 31–32. The Second Circuit has noted, however, that because of the endless varieties of packaging available to producers of goods "typically a trade dress will be arbitrary or fanciful and thus inherently distinctive, and the only real question for the courts will be whether there is a likelihood of confusion between the products." *Paddington*, 996 F.2d at 583.

■ The Supreme Court has stated that an inherently distinctive trade dress is one whose "intrinsic nature serves to identify a particular source of a product," although it may not yet have widespread identification among consumers. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). Consumers generally rely on a product's packaging for information about the product and its manufacturer. *Fun–Damental*, 111 F.3d at 1000. The Court must evaluate the distinctiveness of plaintiff's trade dress "by looking at all its elements and considering the total impression given to the observer." *Id.* at 1001.

■ A product's trade dress "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer. These other elements include the appearance of labels, wrappers, and containers used in packaging a product as well as displays and other materials used in presenting the product to prospective purchasers." *Id.* at 999 (quotations and citations omitted). It is not the individual elements, viewed in isolation, that make up a product's trade dress but the overall impression of each of the elements in combination with one another that constitutes a product's trade dress. As the Second Circuit noted, "[w]hile each of the[ ] elements [of a product's trade dress] individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness. If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements." *Paddington*, 996 F.2d at 584.

■ Plaintiff has identified the elements of its trade dress for which it seek protec-

tion: its clear wrapper, a picture of fruit in a life-like pose conveying the flavor of the bar, FrozFruit's rainbow logo with fruit appearing in rainbow text and "Froz" appearing in blue text, a yellow banner announcing "CHUNKS OF FRUIT" or "REAL FRUIT" in black capital lettering, and a banner announcing that the product is a "GOURMET FRUIT BAR". *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d. Cir.2001) (requiring plaintiff to set forth the elements of their trade dress). I conclude that the combination and unique placement of these elements on the packaging creates an inherently distinctive trade dress.

▮ It is true, as defendants contend, that many of the individual components in FrozFruit's trade dress are found on other packaging both inside and outside of the frozen fruit bar market. Specifically, they cite to the clear wrapper, the use of blue font to denote a "cold" product, the use of rainbow lettering, the use of fruit images on packaging and the use of a yellow banner. (Def.Ex. A3–A4, A6–A–8) The Second Circuit has reiterated on numerous occasions that the use of numerous generic or descriptive elements comprising a party's trade dress or the use of design elements that are common within the particular industry will not destroy the distinctiveness of that trade dress, it is the overall impression that is at the epicenter of the distinctiveness inquiry. *See Fun–Damental*, 111 F.3d at 1001; *Paddington*, 996 F.2d at 584. Here, the combination of these design elements as they appear on the FrozFruit trade dress makes the trade dress distinctive and not merely generic or descriptive.

The tone and layout of colors, the style of lettering and design, and the placement of lettering on the FrozFruit impulse bar wrapper highlight the distinctiveness of FrozFruit's trade dress. None of the fruit bars that compete in the New York metro-

politan impulse bar market use a trade dress similar to FrozFruit except Fruit–A–Freeze. For example, Edy's Whole Fruit Juice Bars appears in an opaque wrapper containing images of fruit that wallpaper the wrapper. The bar also has photos of the fruit bar and a white, blue, and green strip at the top with "Whole Fruit" written in white print over the images of the bar. (Boyle Decl. Ex. 2) Dole Fruit–N–Juice bars, on the other hand, come in a blue and white opaque package with a photo of the bar and a blue banner that announces in yellow capital lettering "ALL NATURAL FAT FREE". The wrapper also contains the distinctive red and yellow Dole logo at its center and a picture of a carton of strawberries. (Boyle Decl. Ex. 2)

Additionally, other competitors like Chunks O'Frutti, FrütStix and LaSalle Fruity Fruit impulse bars, while employing certain common elements found on many impulse fruit bars, do not mimic FrozFruit's design. (Paradise Decl. Exs. 1, 3, 17) Defendants point to the fact that the wording "chunks of fruit" or "fruit chunks" appears on the LaSalle and Tropicana bars. (Paradise Decl. Exs. 9, 17) They also highlight that many fruit bars contains images of real fruit including: LaSalle fruit bars, Dole Fruit–N–Juice bars, Helados Mexicos bars, Chunks O'Frutti bars, and Fruitful bars. (Paradise Exs. 1, 2, 12, 15, 17) However, none of these elements appear in the same way on the packaging of these products as they appear on the FrozFruit and Fruit–A–Freeze packaging. In additional, some of these products, including Helados Mexicos and Chunks O'Frutti, do not compete in the New York metropolitan impulse bar market, which is the relevant market for the Court's inquiry. (Stein Dep. 52) *See Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F.Supp.2d 355, 374 (S.D.N.Y. 2003) (noting that there can be different sectors within a certain market or industry

and the relevant market is the market in which the two products compete).

Defendants urge the Court to consider fruit bars sold in multi-packs. Putting aside that these examples are not included in the relevant market of single-serve fruit bars, defendants' illustrations do not prove the point that the elements found in plaintiff's trade dress have become so commonplace as to render FrozFruit's trade dress generic. The way in which these common components, (e.g. rainbow text, realistic fruit images, text announcing "Real Fruit" or "Chunks of Fruit", and the use of banners) are used on other products does not create the same overall impression as the use of these elements on FrozFruit's package. These elements, found in other packaging, are not all used in combination with one another nor are the common elements that are used exploited in the same manner. Indeed, a simple glance differentiates all of these packages from FrozFruit's package.

Defendants argue that the trade dress on the fruit bars sold in multi-pack boxes of Whole Foods 365 Everyday Value Frozen Fruit Bars destroy any claim of inherent distinctiveness. (Paradise Decl. Ex. 20) These bars are manufactured by Fruit–Ices under a private labeling agreement with Whole Foods. The internal packaging on each bar contained within the multi-pack is comprised of several of the same elements as the FrozFruit impulse bar including: the clear wrapper, the same realistic fruit images and the "CHUNKS OF FRUIT" or "REAL FRUIT" banner. (Paradise Decl. Ex. 20) However, the packaging does not contain the distinctive FrozFruit logo that dominates the packaging. Instead the logo is a blue, green, black, red and yellow block with the number 365 appearing in white lettering in the middle black box and pictures of a snowflake, flower, leaf and sun appearing the blue, green, red and yellow boxes respectively.

The Whole Foods 365 external packaging, which informs the buyer's immediate purchasing decision, also differs greatly from the FrozFruit multi-pack packaging. (Supp. Edelstein Decl. Ex. 3) The Whole Foods 365 bar multi-pack box contains the same 365 block logo previously described on a background with images of the fruit representing the flavor of the bars. For example, the tropical flavored 365 frozen fruit bar box contains a background of realistic images of coconuts, strawberries and pineapple which encompass the whole front face of the external package. (Supp. Edelstein Decl. Ex. 3) Over this background is a large photo of the fruit bar centered in the middle of the package with plain white and black type announcing, on two separate lines of text, that the bars are "Tropical FROZEN FRUIT BARS". Underneath this logo in plain black font are three bullet-points, appearing on separate lines, stating, "Made with Real Fruit", "Fat Free" and "4 Individually Wrapped Bars". Multipacks of FrozFruit, in comparison, contain the distinctive FrozFruit rainbow logo and small realistic fruit images that appear on the impulse bar. (Def. Hearing Ex. A8) The package also contains a picture of the fruit bar on a white and blue background. The images are laid out horizontally, as opposed to the vertical layout on the 365 Whole Foods' package; in addition the fruit images that appear on the FrozFruit box are small and encompass a small fraction of the overall package, while the 365 Whole Fruit bars' package is covered with a background of fruit imagery. Moreover, the Whole Foods 365 bars do not compete in the impulse bar market.

Defendants' contention that FrozFruit's trade dress is generic because other products within the market use similar design

elements fails because that argument ignores the relevant inquiry—the overall impression that the trade dress provides to the consumer. As the Second Circuit noted in *Paddington*, 996 F.2d at 584, "One could no more deny protection to a trade dress for using commonly used elements than one could deny protection to a trademark because it consisted of a combination of commonly used letters of the alphabet." Here, plaintiff's trade dress contains the non-generic FrozFruit logo, which plays a significant role in differentiating FrozFruit from other products. Employing the "total look approach" set forth by the Second Circuit, *see Fun–Damental*, 111 F.3d at 1001, the Court finds that FrozFruit's trade dress is inherently distinctive, and therefore it need not reach the question of secondary meaning in the marketplace. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct at 2757–58.

### B. *Functional Design*

 As plaintiff has met its burden of demonstrating that its trade dress is inherently distinctive, it must now meet the next hurdle of demonstrating that its trade dress is not functional. "When considering the functionality of a trade dress, we must assess the degree of usefulness of the similar features on the competing dress, the degree of similarity between the non-useful, ornamental features of the packaging, and the feasibility of alternatives to the useful features." *See Fun–Damental*, 111 F.3d at 1002. Accordingly, defendants must show more than the usefulness of plaintiff's packaging; they must show that the features, including the ornamental features in question, are essential to effective competition in a particular market. *Id.*

 The functionality requirement serves a useful and necessary purpose. "When a court protects a trade symbol it precludes competitors from using the same symbol, and if that protection covers a functional feature, the first producer thereby obtains a potential monopoly placing other producers at a competitive disadvantage." *Id.* In the case before me the plaintiff does not seek protection of each of the individual elements contained on its impulse bar packaging. Rather, plaintiff requests protection of the precise configuration of these elements as they appear on FrozFruit impulse bar's wrapper. Plaintiff does not seek to secure a monopoly on the use of fruit imagery or rainbow text or the use of a clear wrapper or the phrasing "Chunks of Fruit" or "Real Fruit". It is the combination of these elements in a single design for a single-serve product that plaintiff seeks to protect.

Defendants' contention that plaintiff's claim must fail because its trade dress is functional and therefore not afforded protection under section 1125(a) is without merit. The question of functionality goes hand in hand with the question of distinctiveness. It is true that if a product's packaging has become so iconic as to represent a category of goods within a market, that style of trade dress may become generic and not entitled to protection. The design of plaintiff's product, however, has not reached such a status within the frozen fruit bar industry. An example of a product that has reached these heights in the food industry is the packaging of lime-flavored soda in green, twelve-ounce cans; this design "is so common in the soft drink industry that such packaging probably is not inherently distinctive". *Paddington*, 996 F.2d at 583–84. Another example is the use of a black rectangular-shaped compact to package make-up within the beauty industry; it has become so universal and familiar to consumers as not to warrant trade dress protection unless it is accompanied by some other distinctive design element. *See Fun–Damental*, 111 F.3d at 1000.

Plaintiff has established that its trade dress is not functional because the combination of elements found in its trade dress are not essential to the use of the product, its quality or its purpose as a frozen fruit bar. Defendants assert, however, that even ornamental features can be deemed functional if the protection of these elements would significantly hinder competition by limiting the range of available product designs. *See Waddington North America Business Trust v. EMI Plastics, Inc.*, 2002 WL 2031372, at *4 (E.D.N.Y. Sept 5, 2002) That is not the case here. Many of plaintiff's competitors in the frozen fruit impulse bar market use different packaging and remain successful. Even defendants, for example on the West Coast, distribute a 3-ounce frozen fruit bar that is competitive despite the fact that its trade dress is wholly dissimilar from the FrozFruit trade dress. (Supp. Popp–Rosenberg Decl. Ex. 1) Defendants have failed to show that the elements of plaintiff's trade dress are functional or that they will be placed at a "significant competitive disadvantage" if they are unable to use the current Fruit–A–Freeze packaging as it appears in the New York metropolitan frozen fruit impulse bar market. Accordingly, defendants' functionality argument fails. *See Fun–Damental*, 111 F.3d at 1002.

### C. Likelihood of Confusion—The Polaroid Factors

The next issue that this Court must decide is whether the similarities of the Froz–Fruit and Fruit–A–Freeze trade dresses, as they appear in the New York impulse market, cause consumers to be misled or confused as to the source of the goods. This inquiry requires an examination of the *Polaroid* factors.

### 1. Strength of the Trademark

The trade dress for which protection is sought should not be examined in the abstract; it is "the strength of a trade dress in its commercial context" that is critical to the Court's likelihood of confusion inquiry. *Fun–Damental*, 111 F.3d at 1003. The strength of a party's trade dress refers back to the Court's distinctiveness inquiry under the *Abercrombie* categories and also may involve an examination of secondary meaning. *Id.; Paddington*, 996 F.2d at 585. The Court must therefore examine the "tendency [of the trade dress] to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Fun–Damental*, 111 F.3d at 1003 (quotations and citations omitted).

As previously discussed, plaintiff's trade dress is inherently distinctive. The design elements appear in a novel way that is not otherwise common in the New York metropolitan impulse bar market. The logo, design and placement of fruit imagery, banners and text make the look of the product distinctive to consumers. In addition, plaintiffs have adduced evidence that FrozFruit has gained secondary meaning in the relevant marketplace. In determining if a product's trade dress has acquired a secondary meaning, the Court may look to: (1) the length and exclusivity of the trade dress, (2) advertising expenditures, (3) sales success, (4) unsolicited media coverage, and (5) attempts to plagiarize the mark. *See George Basch Co., v. Blue Coral, Inc.*, 968 F.2d 1532, 1536 (2d Cir.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

Plaintiff has submitted evidence establishing that it has employed its current trade dress for approximately six years, since 1998. (Edelstein Dec. ¶ 11) Plaintiff has also established that they have spent approximately $4.5 million on their advertising efforts from 2001 through the first half of 2004. (Edelstein Dec. ¶ 17) While plaintiff does not break down the expendi-

ture of its advertising budget for the New York impulse bar market, it would be logical that a large portion of these expenditures were centered on the New York impulse market which comprises 50% of plaintiff's total impulse bar sales. (Boyle Decl.¶ 7)

Also, plaintiff has shown that it is a leader within the New York impulse frozen fruit bar market. (Stein Dep. 117) Plaintiff has submitted numerous articles that demonstrate how ingrained FrozFruit has become within the New York impulse frozen fruit bar market. As one New Yorker quoted in *New York Magazine* remarked, "Frozfruits are such a New York staple— Is there a Korean deli or bodega anywhere in the city that doesn't stock them?—that it's a wonder they never scored their own *Seinfeld* homage, a la the black and white cookie." (Popp–Rosenberg Decl. Ex. 1)

Defendants contend that FrozFruit has not acquired secondary meaning in the market because of plaintiff's private labeling activities. This argument is misplaced and unsupported by the record. The Whole Foods 365 bar, upon which defendants rely, does not compete in the impulse frozen fruit bar market. Furthermore, according to plaintiff's sworn testimony, the Whole Foods 365 bar packaging has been discontinued. (Supp. Eldelstein Decl. ¶¶ 8–9) Defendants have failed to establish that plaintiff's private labeling efforts were widespread and impacted consumers' perceptions such to destroy any secondary meaning that could exist within the market.

Defendants have chosen to ignore that plaintiff's private labeling has occurred in the multi-pack supermarket market, which defendants admit is "absolutely a different business" and a "different competitive environment" from the New York impulse frozen fruit bar market. (Stein Dep. 46) In order to establish that plaintiff's private labeling efforts have destroyed FrozFruit's

trade dress' secondary meaning within the marketplace, defendants had to produce evidence that Fruit–Ices' private labeling activities had become so widespread as to make their trade dress indistinguishable from other privately labeled products in the relevant market. *See Malaco Leaf,* 287 F.Supp.2d at 369–70 (noting that the plaintiff's wide spread private labeling practices and use of multiple packaging designs made plaintiff's trade dress weak); *Aerogroup Intern., Inc. v. Marlboro Footworks, Ltd.,* 977 F.Supp. 264, 268 (S.D.N.Y.1997) (the fact that 25% of plaintiff's sales related to private labeling activity lead to a conclusion that plaintiff's design had not gained a secondary meaning in the market). Defendants have not produced such evidence; nor have they adequately rebutted plaintiff's proof that FrozFruit's packaging has acquired secondary meaning in the frozen fruit impulse bar market.

### 2. *Similarity of the Marks*

In order to determine the similarity between plaintiff and defendants' trade dress, I must examine the overall look of the products and the detailed elements that create those overall looks. *See Paddington,* 996 F.2d at 586. Plaintiff's trade dress is composed of the following elements: (1) a clear wrapper, (2) the FrozFruit logo with "Froz" appearing in blue lettering and the letters in the word "Fruit" appearing in multi-colored rainbow text with each letter appearing in orange, purple, red, yellow and green respectively, (3) small stylized pictures of posed fruit marking the flavor of the bar, (4) a yellow banner, placed over the fruit image, announcing, "CHUNKS OF FRUIT" or "REAL FRUIT" (depending on the flavor) in black capital lettering, (5) the banner "GOURMET FRUIT BAR" appearing above the FrozFruit logo in white or blue capital letter text and (6) text appearing in

blue or white lettering that informs the consumer of flavor of the bar, the fact that it is "100% Natural" and/or "100% Fat Free" (depending on flavor) and that the bar is "4 Fl. OZ. (118ml)". Defendants' dress contains these same elements appearing in the same dimensions, colors and fonts with a virtually identical arrangement. Defendants' Fruit–A–Freeze trade dress is composed of the following elements: (1) a clear wrapper, (2) the Fruit–A–Freeze logo with "–A–Freeze" appearing in blue lettering and the letters in the word "Fruit" appearing in multi-colored rainbow text with each letter appearing in green, orange, yellow, red, and purple and respectively, (3) small stylized pictures of posed fruit, which are practically identical to the images used on FrozFruit impulse bars, marking the flavor of the bar, (4) a yellow banner, partially placed over the fruit image, announcing, "CHUNKS OF FRUIT" or "REAL FRUIT" (depending on the flavor) in black capital lettering, (5) the banner "GOURMET FRUIT BAR" appearing below the Fruit–A–Freeze logo in blue capital letter text and (6) text appearing in blue lettering with a white lettering shadow that informs the consumer of the flavor of the bar, the fact that it is "Fat Free" and that the bar is "4 FL. OZ. (118ml)". The Fruit–A–Freeze mark and the design are protected under U.S. Trademark Reg. Nos. 1,209,937 and 1,289,-268. (Def.Mem.2)

The similarity of the fruit images between the two products depends on the flavor of the actual bar. The images used on the strawberry, lemon, banana and lime Fruit–A–Freeze bars are virtually identical in size and composition to the images found on the FrozFruit wrapper. (Edelstein Decl. Exs. 4, 10) The images found on the coconut and pineapple bars differ slightly in that the FrozFruit bar shows a half-coconut with two small coconuts chunks, while the Fruit–A–Freeze bar shows a half Coconut with a large quarter

piece of coconut covering it. Similarly the FrozFruit bar shows a half pineapple, including its bushy green top, while the Fruit–A–Freeze bar shows pineapple quarters without the green top. Nevertheless, the same lettering scheme and style, and the composition of the elements on the clear wrapper make the products virtually identical in appearance despite the minimal differences outlined above. See Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 218 (2d Cir.2003); Paddington, 996 F.2d at 586; Car–Freshner Corp. v. Big Lots Stores, Inc., 314 F.Supp.2d 145, 150 (N.D.N.Y.2004). The similarity is made more striking by the fact that other brands of impulse bars sold in the New York metropolitan area do not remotely resemble plaintiff's trade dress. See Energybrands, Inc. v. Beverage Marketing USA, Inc., 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002).

The effect of the visual similarity of the packaging is not cured, as defendants contend, by the fact that the FrozFruit logo appears on plaintiff's impulse bar and the Fruit–A–Freeze logo appears on defendants' impulse bar. Defendants' reliance on Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc., 973 F.2d 1033, 1046 (2d Cir. 1992) to support this position is misplaced. Defendants assert that the holding of that case established that the prominent use of a party's trade name on a its packaging eliminates the possibility of confusion based on similarity of trade dress. Id. at 1046. However, as the Second Circuit ruled in Fun–Damental, 111 F.3d at 1003, while "the prominent presence of well-known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other Polaroid factors", the use of a distinctive trade name is not dispositive. Therefore, like in this case, the Court ruled that "the instant case involve[d] trade names much less recognized" than "Tylenol" and "Excedrin, at

issue in *Bristol–Myers Squibb*, and we think the district court had ample ground for concluding that consumers are more likely to remember the [impulse product's] packaging than its name." *Id.*

A consumer selecting a one dollar frozen fruit bar from a convenience store or delicatessen freezer would be hard pressed to differentiate the small coloration differences between the green "F" in "Fruit" on Fruit–A–Freeze's package and the orange "F" in "Fruit" in FrozFruit's package. Nor would the consumer notice the subtleties found in the parties' fruit images. The segregation of these minute details, when considered in light of the consumer's overall impression of the products, does not destroy the reality that the products are virtually identical as they appear in the marketplace. *See Car–Freshner Corp.,* 314 F.Supp.2d at 150 ("juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar.") (quotations and citation omitted). In short, the overall similarities in the products factor heavily in the finding that there is a likelihood of consumer confusion.

### 3. *Proximity of the Marks & Bridging the Gap*

These factors are not disputed. Both parties agree that the products directly compete within the same market.

### 4. *Actual Confusion*

While "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act," *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986), the Second Circuit has noted that it "is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion". *Virgin Enterprises Ltd. v. Nawab,* 335 F.3d 141, 151 (2d Cir.2003). The Circuit has "therefore deemed evidence of actual confusion 'particularly rele-

vant'" to the likelihood of confusion inquiry. *Id.* In this case, plaintiff has produced evidence concerning actual confusion by two FrozFruit customers, an employee of one of its distributors and a convenience store manager who sells FrozFruit bars.

Plaintiff proffers the declaration of Cassandra Hall, a customer Service Representative at Fruit–Ices, in which she describes two calls she received from FrozFruit customers in the short time span since defendants introduced their product on July 2, 2004. The first call came on July 19 from a female customer who was concerned because she bought what she felt to be an "inferior" frozen fruit bar posing as a FrozFruit bar from a store in the New York metropolitan area. (Hall Dec. Ex. 1) The second complaint, on July 26, came from another female customer named "Regeen" who purchased a Fruit–A–Freeze bar in Brooklyn, New York. Regeen called to inquire if FrozFruit was discontinuing its product or changing its name. (Hall Decl. Ex. 2) Plaintiff's Cassandra reports that both callers complained about the "inferior" quality of the bar and the identical wrapping found on the imposter bars. (Hall Decl. Exs. 1, 2)

Plaintiff has also produced evidence of limited actual confusion that extends beyond FrozFruit's consumers. The declaration of Ronald Boyle, Fruit–Ices' National Sale Manager, describes one instance in which he and another Fruit–Ices' employee questioned a Brooklyn store manager about the Fruit–A–Freeze impulse bar. According to Boyle, when questioned about CoolBrands' new product, the store manager replied that he was unaware that it was a different product from FrozFruit and that the Fruit–A–Freeze package "looked to him to be just the same as the FrozFruit package." (Boyle Decl. ¶ 22) Defendants objected to this statement on hearsay grounds. The statement, however, is not offered to prove the similarities

of the products but rather that expressions of confusion have been made.

Finally, plaintiffs offer the declaration of David S. Edelstein, the Chief Executive Office and Vice President of Fruit–Ices. In his declaration Eldelstein describes an occasion in which he visited a distribution warehouse that stocked FrozFruit impulse bars. When Eldelstein asked one of the warehouse workers to provide him with sample of the mango FrozFruit impulse bar, the worker, named Arnold, brought Edelstein a box of impulse market mango-flavored Fruit–A–Freeze bars. When Eldelstein informed him that the bars were not FrozFruit, Arnold replied, "it's the same thing ... it's FrozFruit". (Eldelstein Decl. ¶ 38)

These separate occasions, all occurring in the few shorts weeks after defendants first launched their new impulse bars, are probative of actual confusion created by defendants' substantially identical packaging.

5. *Defendants' Good Faith*

"In assessing bad faith, the court considers whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill." *Malaco Leaf,* 287 F.Supp.2d at 376. However, the Court must also keep in mind that "[w]hile intentional copying can raise a presumption of consumer confusion, the intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 124 (2d Cir.2001) (internal citations, quotations and alterations omitted). While there may be valid reasons for copying the successful elements of a competitor's product when launching a new product in that market, *see Fun–Damental,* 111 F.3d at 1005, placing a virtually identical product in substan-

tially identical packaging in the same market with the intent to create consumer confusion will establish bad faith. *Id.* at 1004. I find that plaintiff has established a probability of success in showing bad faith on the part of defendants.

Plaintiff has produced evidence establishing that CoolBrands was aware of FrozFruit's trade dress and its success within the market and therefore sought to reproduce that success by reproducing the FrozFruit trade dress in all material respects, except for the Fuit–A–Freeze logo. Plaintiffs have shown that CoolBrands only sought to change its packaging in the New York impulse bar market. Within the New York market it only changed its design in the single-serve impulse bar market and not in the supermarket multi-pack market. Plaintiff has also shown that while defendants' designers viewed numerous impulse bars, the only bar whose design they directly copied was the FrozFruit design. In addition, plaintiff has produced e-mails establishing that defendants' design team repeatedly viewed and employed elements found in the FrozFruit wrapper and compared the new Fruit–A–Freeze wrapper to the FrozFruit model. Tellingly, Fruit–Ices has produced evidence that defendants selected the substantially identical trade dress only after CoolBrands was unable to buy FrozFruit's manufacturer, Fruit Ices and that CoolBrands warned Fruit–Ices that if the sale of Fruit–Ices did not go through, "things would get ugly." Plaintiff has also established that the previous packaging that Fruit–A–Freeze had chosen, prior to the breakdown in negotiations, was substantially different than the current iteration of defendants' impulse bar trade dress leading defendants to copy its trade dress only after it failed to successfully buy Fruit–Ices.

Taken as a whole, the foregoing leads the Court conclude that plaintiff is likely to

succeed in establishing that defendants acted in bad faith. *See Paddington,* 996 F.2d at 587 (stating that when defendants' "prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith."); *Energybrands,* 2002 WL 826814, at *2 (failed attempt to acquire plaintiff's company followed by the launch of a product that is identical to plaintiff's product and competes within the same market supports a finding of intentional bad faith copying). The finding of a likelihood of success in establishing bad faith weighs heavily on the question of the likelihood of consumer confusion. Defendants' purpose was to cause consumer confusion and the evidence supports the conclusion that they are likely to succeed in creating such confusion.

### 6. *Quality of the Products*

Plaintiffs and defendants have not adduced evidence concerning the respective quality of their products. There is no comparison of the ingredients used and plaintiff readily admits that Fruit–A–Freeze bars are made "in a manner identical to Fruit–Ices' " process for making FrozFruit bars. (Edelstein Decl. ¶ 34) While plaintiffs contend that the two customer complaints described in the Hall Declaration, highlight the inferior nature of the defendant's Fruit–A–Freeze product, two customers' individual tastes will not meet the threshold of establishing that defendants' impulse bars are of an inferior quality.

### 7. *Sophistication of the Purchasers*

The sophistication of purchasers, as measured by the care likely used by consumers when purchasing a particular product, is a factor to be taken into account. "The more sophisticated the consumers of a product are, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." *Paddington,* 996 F.2d at 587 (quotations and citations omitted). The fact that the parties' products sell for approximately a dollar (Tr. 51) and that the products are specifically designed and marketed so they will be bought on an impulse, leads the Court to the conclusion that little sophistication is brought to bear on the selection of the brand of single-serve frozen fruit bar in a convenience store freezer. Impulse items that are specifically designed to be "purchased based on a consumer's quick decision made while in the store, without comparison shopping or investigation" normally carry a low level of consumer sophistication. *Fun–Damental,* 111 F.3d at 997, 1004. Consumers may take a moment to choose their preferred flavor but many consumers, thinking that they are looking at the familiar FrozFruit packaging, would not take the time for a closer inspection to determine otherwise.

### Conclusion

Plaintiff has demonstrated a likelihood of success on the merits and immediate irreparable harm if no injunction is issued. Accordingly, defendants, and all those acting in concert or participating with them, are hereby enjoined from distributing, shipping, advertising, marketing, promoting, selling and/or offering for sale Fruit–A–Freeze single-sale fruit bars in their current trade dress or substantially similar trade dress in the New York metropolitan impulse bar market constituting the territory stretching from southern Connecticut through New York City and into central New Jersey.

The injunction will become effective upon the posting by plaintiff of a bond in the amount of $1,000,000.

SO ORDERED.

# APPENDIX 1